RICHARD K. FRUIN *v.* COLONNADE ONE AT OLD GREENWICH LIMITED PARTNERSHIP ET AL.
(13185)

DUPONT, C. J., and LAVERY and HENNESSY, Js.

Argued April 25—decision released July 11, 1995

*Peter M. Ryan,* for the appellant (plaintiff).

*Paul L. McCullough,* for the appellees (defendants).

DUPONT, C. J. The plaintiff appeals from a judgment rendered for the defendants in this breach of contract action. The plaintiff claims that he is entitled to a refund of his down payment on a condominium because (1) the contract between the parties is void as violative of the statute of frauds, and (2) the defendants violated the Common Interest Ownership Act (CIOA).[1] We affirm the judgment of the trial court.

Certain facts are relevant to this appeal. In May, 1989, the plaintiff contracted with the defendants to purchase a condominium unit yet to be constructed. The

---

[1] The plaintiff actually presents his claims as four "points" of error: (1) the contract between the parties is void as violative of the statute of frauds; (2) due to variances in the initial public offering statement and final recorded declaration of condominium, the defendants did not construct the unit for which the plaintiff contracted; (3) the defendants violated the CIOA; and (4) there were material variances between the recorded declaration of condominium and the copy set forth in the public offering statement. These last three claims of error overlap, and, therefore, we will discuss them together under the rubric of claimed violations of the CIOA.

purchase price for the unit was $255,000. The plaintiff gave the defendants a check in the amount of $25,000 as a down payment. The contract contained a default clause allowing the defendants to retain the down payment as liquidated damages if the plaintiff reneged on the agreement. The contract contained no contingencies and specified a closing date of August 15, 1990. The contract also provided that the defendants could extend the closing for a period not to exceed ninety days, and, if the defendants did choose to extend the closing, the defendants had to provide the plaintiff with a notice to close by a date within the extension period. If the closing was extended, the closing had to take place within ten days of the notice to the plaintiff.

When it became apparent that the defendants would not complete construction of the unit in question by the original closing date, the plaintiff and the defendants exchanged several letters regarding a closing date. The plaintiff wrote to the defendants in June, 1990, indicating that he was "not in a hurry to close." In reply, the defendants indicated that the closing could be extended at least into September, 1990, and that it might be possible "to push the closing back another couple of weeks . . . but this cannot be guaranteed at this time."

In the meantime, the plaintiff had enlisted the aid of the defendants' sales office in an attempt to sell the unit to a third party.[2] On August 10, 1990, the defendants wrote to the plaintiff that the closing could be delayed until October 15, 1990, but that the closing had to take place on that date whether a new pur-

[2] The trial court found "the relevance of this attempt to resell or assign his contract of sale to the resolution of this case is that it illustrates that plaintiff had, by the summer of 1990, decided that he did not wish to purchase [the unit]."

chaser for the plaintiff's unit was found. The plaintiff countersigned the letter and returned it to the defendants.

On September 26, 1990, almost sixteen months after the execution of the contract to buy the condominium unit, the plaintiff wrote to the defendants requesting "an indefinite extension" of the closing date. The stated reason was that the plaintiff was an officer in a reserve unit of the United States Army and he thought that he might be called to active duty because of the Persian Gulf crisis.[3] The defendants' attorney responded by letter stating that the defendants would agree to a postponement, but that the closing had to take place no later than January 15, 1991. The plaintiff rejected the offer by the defendants to extend the closing date to January 15, 1991, and again mentioned the possibility of being called to active military duty, and noted the inability of the defendants' sales agency to resell the unit on his behalf.

The plaintiff failed to close on January 15, 1991, and the defendants exercised the default clause in the contract and retained the down payment of $25,000 as liquidated damages. The plaintiff then instituted this action to recover the $25,000. In his complaint, the plaintiff alleged that (1) because the defendants had been unable to close on October 15, 1990, as provided by the contract, the defendants were in breach and the contract had accordingly been terminated, (2) the contract had been mutually rescinded, (3) the contract violated the statute of frauds because the purchase price and closing date were too indefinite, (4) the defendants breached the implied covenant of good faith and fair dealing, (5) the defendants committed eleven violations

---

[3] At trial, the plaintiff introduced as an exhibit a memorandum written by the adjutant of his reserve unit, dated August 15, 1990, to the effect that the "unit has been placed on alert . . . for possible use in rail load-out operations. While this is not an activation, it is a good time to review your personal affairs."

of CIOA, General Statutes § 47-200 et seq., (6) the defendants violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., (7) the defendants engaged in a civil conspiracy to damage the plaintiff by violating CIOA in a number of ways, including the publication of a misleading and illegal public offering statement, (8) the defendants were unjustly enriched, and (9) there were material variances between the public offering statement and the recorded declaration of condominium.

The case was tried to the court. The court concluded that the plaintiff had forfeited his deposit and that each of the nine counts in the complaint was without merit.

In its memorandum of decision, the court found that it became impossible for the defendants to meet the original closing date of August 15, 1990, due to construction delays, but that the contract provided for an extension of up to ninety days after August 15, 1990, and that the defendants offered to close on October 15, 1990, which was within this extension period. The court also found that the plaintiff initially accepted the October 15, 1990 closing date, but then asked for an indefinite extension. The court found that the defendants rejected that proposal but did offer to close on January 15, 1991, and that the plaintiff failed to close by that date. The court concluded from these facts that the plaintiff breached the contract and had no right to recover his $25,000 down payment.

The court also concluded from the plaintiff's testimony that the sole reason for his default was that he changed his mind about purchasing the condominium unit,[4] partially because he had been unable to sell his

---

[4] The trial court found: "With respect to the contention that the defendants violated CIOA, and that the [public offering statement] and recorded Declaration of Condominium were at variance, the plaintiff testified: (i) that he had read both documents; (ii) that he was represented by an attorney

New York home. In reaching this conclusion, the court found that the contract had no contingencies, and that the plaintiff had the financial resources to purchase the defendants' condominium unit without selling his other home. With regard to the plaintiff's testimony that he anticipated being called to active military duty, the court found that if that had in fact occurred, a different result might arise under federal legislation,[5] but that because the plaintiff had not been called to active duty and had kept his civilian job, his reserve status did not affect the resolution of the case.

## I

### STATUTE OF FRAUDS

The plaintiff claims that the contract between the parties was violative of the statute of frauds, General Statutes § 52-550, because the purchase price was indefinite. The contract sets the purchase price at $255,000. A rider to the contract provided in relevant part that "[i]f any one bedroom end unit in Old Greenwich Gables having a floor plan and comparable footage as that of [this unit] is sold for a lower price than the price set forth in this Agreement, then the price of the subject unit will be reduced to said lower price, provided such other one bedroom end unit is purchased by a third party who is not directly or indirectly related to the [plaintiff]." The plaintiff argues that the term

. . . at the time he signed the purchase agreement; (iii) that he asked questions of his lawyer about these documents and the purchase agreement; (iv) that he was fully satisfied with the answers received from his lawyer; and (v) violations of CIOA or variations between the [public offering statement] and the Declaration, if any, played no role at all in his decision to terminate the contract. As a result, I have not analyzed each and every alleged violation of CIOA, except to note that they appear overly technical in nature, and serve no role in resolving the issue before the court, which is simply whether the plaintiff is entitled to a refund of his down payment, or whether he breached the purchase agreement and is not so entitled."

[5] See Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. § 501 et seq. (1990).

"comparable" is not definite enough to avoid the proscription of the statute. We are not persuaded.

Section 52-550 (a) provides in relevant part: "No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property . . . ." In Connecticut, therefore, any agreement for the sale of real property or any interest therein must be in writing and signed by the party to be charged. See *Hieble* v. *Hieble*, 164 Conn. 56, 59, 316 A.2d 777 (1972).

The statute of frauds requires that the essential terms and not every term of a contract be set forth therein. *Scinto* v. *Clericuzio*, 1 Conn. App. 566, 568, 474 A.2d 102 (1984). The essential provisions of a contract are the purchase price, the parties, and the subject matter for sale. *Lynch* v. *Davis*, 181 Conn. 434, 438, 435 A.2d 977 (1980). In order to be in compliance with the statute of frauds, therefore, "an agreement must state the contract with such certainty that its essentials can be known from the memorandum itself, without the aid of parol proof . . . ." *Breen* v. *Phelps*, 186 Conn. 86, 92, 439 A.2d 1066 (1982). The statute of frauds is also satisfied where the contract or memorandum contains by reference some other writing or thing certain. *Robert Lawrence Associates, Inc.* v. *Del Vecchio*, 178 Conn. 1, 12-13, 420 A.2d 1142 (1979). The plaintiff argues that the use of the word "comparable" in the purchase agreement at issue here makes it impossible to calculate the purchase price. The plaintiff claims that a comparison between living units is subjective rather than objective and involves a value judgment, and that, therefore, the contract is void because the purchase price is indefinite.

Our courts prefer interpretations that find agreements sufficiently definite to satisfy the statute of frauds. See *Montanaro Bros. Builders, Inc.* v. *Snow,* 190 Conn. 481, 485–86, 460 A.2d 1297 (1983). Moreover, "a contract is enforceable, despite the statute [of frauds], when, subsequent to the making of the contract, there has been conduct that amounts to part performance." *Heyman* v. *CBS, Inc.,* 178 Conn. 215, 222, 423 A.2d 887 (1979). The exchange of correspondence between the parties after the signing of the contract confirms the existence of a contractual relationship between them. Furthermore, we agree with the trial court's conclusion that the purchase price in this contract is unequivocally $255,000, unless a unit similar to the plaintiff's was sold at a lesser price, in which case the plaintiff could purchase his unit at that price. The price of the plaintiff's unit could, therefore, be ascertained with reasonable certainty, and there is no violation of the statute of frauds.

## II

### ALLEGED CIOA VIOLATIONS

The plaintiff claims that his duty to perform the contract was excused by the defendants' alleged noncompliance with CIOA, and he is therefore entitled to a refund of his down payment. The plaintiff cites numerous instances of the defendants' alleged noncompliance with CIOA.[6] These claimed violations essentially

---

[6] The plaintiff claims that the defendants (1) placed a limitation on their obligation to abide by warranties and failed to disclose adequately these limitations in contravention of General Statutes § 47-264 (a) (10), (2) failed to disclose monetary encumbrances in violation of General Statutes § 47-264 (a) (8), (3) failed to disclose the existence of a lawsuit, (4) failed to hold the plaintiff's deposit in an escrow account in contravention of General Statutes § 47-264 (a) (13), (5) failed to disclose all of the necessary financing arrangements made to complete the project in contravention of General Statutes § 47-264 (a) (17), (6) disclaimed its obligation to pay common expenses on any unit it continued to own in contravention of General Statutes § 47-257 (g), (7) limited statutory warranties in contravention of both Gen-

present one issue, namely, whether violations of CIOA are alone sufficient to excuse a purchaser from performance, or whether there must be a nexus between the claimed violations of CIOA and the plaintiff's breach of the purchase agreement. We hold that such a nexus must exist, and agree with the trial court that in this case the plaintiff's breach of the purchase agreement had no relation to any violations of CIOA by the defendants, and that, therefore, the plaintiff is not entitled to a refund of his down payment.

"The Common Interest Ownership Act [General Statutes § 47-200 et seq.] is a comprehensive legislative scheme regulating all forms of common interest ownership that is largely modeled on the Uniform Common Interest Ownership Act." *Nicotra Wieler Investment Management, Inc.* v. *Grower*, 207 Conn. 441, 447, 541 A.2d 1226 (1988). It "is a detailed statutory scheme governing the creation, organization and management of common interest communities and contemplates the voluntary participation of the owners. It entails the drafting and filing of a declaration describing the location and configuration of the real property, development rights, and restrictions on its use, occupancy and alienation; General Statutes §§ 47-220, 47-224; the enactment of bylaws; General Statutes § 47-248; and

eral Statutes § 47-276 (a) and the Uniform Commercial Code, and (8) "badly" organized the public offering statement in contravention of General Statutes §§ 47-263 and 47-264.

The plaintiff also claims that, in violation of the CIOA, (1) the unit for which he had contracted was not built by the defendants in that there were variances in the dimensions of the kitchen, dining room, and living room in the unit contracted for and the unit actually built, as reflected in the original document of condominium (DOC) included in the public offering statement and the recorded DOC and (2) there were other material variances between the original DOC and the recorded DOC, including a change in the number of units to be constructed and the elimination of assigned parking spaces, and that the plaintiff was not informed of these changes because the defendants never provided him with amendments to the DOC as required by General Statutes §§ 47-269 (a) and 47-264 (b).

the establishment of a unit owners' association; General Statutes § 47-243; and an executive board to act on its behalf. General Statutes § 47-245. It anticipates group decision-making relating to the development of a budget, the maintenance and repair of the common elements, the placement of insurance, and the provision for common expenses and common liabilities. General Statutes §§ 47-244, 47-245, 47-255, 47-249." *Wilcox* v. *Willard Shopping Center Associates*, 208 Conn. 318, 326–27, 544 A.2d 1207 (1988).

The CIOA further provides in relevant part: "If a declarant or any other person subject to this chapter fails to comply with any of its provisions or any provision of the declaration or bylaws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief. Punitive damages may be awarded for a wilful failure to comply with this chapter. . . ." General Statutes § 47-278. Remedies under CIOA are to be liberally construed so that an aggrieved party may be put in as good a position as if the other party had fully performed. *Grey* v. *Coastal States Holding Co.*, 22 Conn. App. 497, 504–505, 578 A.2d 1080, cert. denied, 216 Conn. 817, 380 A.2d 57 (1990). CIOA also provides that supplemental general principles of law are applicable in interpreting the act. General Statutes § 47-207.[7]

There is, however, a paucity of reported case law in Connecticut on causes of action commenced and remedies awarded under CIOA, and the issue raised by the plaintiff is one of first appellate impression in Connect-

---

[7] General Statutes § 47-207 provides: "The principles of law and equity, including the law of corporations and unincorporated associations, the law of real property, and the law relative to capacity to contract, principal and agent, eminent domain, estoppel, fraud, misrepresentation, duress, coercion, mistake, receivership, substantial performance, or other validating or invalidating cause supplement the provisions of this chapter, except to the extent inconsistent with this chapter."

icut. At oral argument before this court, the plaintiff analogized his claim to one brought under the Home Improvement Act (HIA), General Statutes § 20-418 et seq.[8] Although the language of CIOA is not similar to that in HIA, HIA is similar to CIOA in that its "objective . . . is to promote understanding by the consumer, to ensure his ability to make an informed decision and to protect him from substantial work by an unscrupulous contractor. See *Habetz* v. *Condon,* 224 Conn. 231, 239, 618 A.2d 501 (1992). Both statutes, then, are essentially consumer protection statutes. We, therefore, turn to cases interpreting HIA to guide our resolution of the present case.

The plaintiff argues that in Connecticut absent bad faith on the part of the homeowner, HIA permits no recovery by a home improvement contractor under theories of quantum meruit or unjust enrichment if the home improvement contract fails to comply with the statutory requirements of the act. See id., 239–40. The plaintiff urges that we adopt a similar rule for contracts that fail to comply with CIOA, and, accordingly, reverse the trial court's ruling that the plaintiff is not entitled to a refund of his down payment.

Homeowners may not, however, as the plaintiff suggests they may, repudiate any contract that fails to meet HIA's criteria. See *Dinnis* v. *Roberts,* 35 Conn.

---

[8] General Statutes § 20-429 provides in pertinent part: "(a) No home improvement contract shall be valid or enforceable against an owner unless it: (1) Is in writing, (2) is signed by the owner and the contractor, (3) contains the entire agreement between the owner and the contractor, (4) contains the date of the transaction, (5) contains the name and address of the contractor, (6) contains a notice of the owner's cancellation rights in accordance with the provisions of chapter 740 [the Home Solicitation Sales Act, General Statutes § 42-134a et seq.], (7) contains a starting date and completion date, and (8) is entered into by a registered salesman or registered contractor. Each change in the terms and conditions of a contract shall be in writing and shall be signed by the owner and contractor . . . ."

App. 253, 257, 644 A.2d 971, cert. denied, 231 Conn. 924, 648 A.2d 162 (1994). " '[P]roof of a homeowner's bad faith will preclude that homeowner from repudiating with impunity a home improvement contract that violates the act.' " Id. "Bad faith" is defined in HIA cases as involving "actual or constructive fraud, or a design to mislead or deceive another, *or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested* or sinister *motive.*" (Emphasis added; internal quotation marks omitted.) *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 248, 618 A.2d 506 (1992).

The general principle behind the bad faith exception in the HIA cases is that an individual should not profit from his own neglect to fulfill a contractual obligation that is completely unrelated to any violation of the statute. "The question is not whether the legislature specifically carved out this bad faith exception . . . but whether, in the absence of specific legislative indication otherwise, a doctrine founded on public policy and containing a strong strain of estoppel can prevent a misbehaving party from invoking the benefits of a statute which is absolute on its face. To deny the contractor any opportunity of recovery after he has completed his end of the bargain if he has persuaded the trier of fact that a statutory remedy is being invoked by a homeowner in bad faith would be to countenance a gross injustice and indeed to encourage its perpetuation and to assure its success." *Habetz* v. *Condon,* supra, 224 Conn. 240.

"A bad faith exception is designed to prevent a party's disavowal of previous conduct if such repudiation would not be responsive to demands of justice and good conscience. The law does not permit the exercise of a right to repudiate a contract when the exercise

of such a right in bad faith would work an injustice. Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . To demand this implicit component but do nothing about its absence would be at best incongruous, and, more accurately, grossly unfair. Thus, a contractor, otherwise precluded from recovering moneys owed for his work because of a violation of [HIA], must be permitted to assert that the homeowner's bad faith precludes him from safely repudiating the contract and hiding behind [HIA] in order to bar the contractor's recovery." (Citations omitted.) Id., 238.

This is not a case in which the plaintiff brought the alleged CIOA violations to the defendants' attention prior to a closing date or a case where the plaintiff, *prior to his breach of the contract*, claimed violations concerning the quality, condition, or appurtenances of the unit bargained for, as, for example, the use of a particular parking space, or a physical change in the unit. Whether there actually were any violations of CIOA in this case is irrelevant because the plaintiff did not assert these violations until *after* he had breached the agreement by refusing to close on the property. Had the plaintiff been in breach by anticipatory repudiation of his contract, which is not the case here, the defendants would have had the choice either of correcting the alleged CIOA violations or of rescinding the contract. See *Pullman, Comley, Bradley & Reeves* v. *Tuck-it away, Bridgeport, Inc.*, 28 Conn. App. 460, 611 A.2d 435, cert. denied, 223 Conn. 926, 614 A.2d 825 (1992); see also *Sagamore Corp.* v. *Willcutt*, 120 Conn. 315, 180 A. 464 (1935).

The plaintiff in this case testified at trial that the sole reason for his default was that he changed his mind

about purchasing the defendants' condominium unit, and that the progress of construction, the contents of the public offering statement, and the contents of the recorded declaration of condominium had no effect on his decision to default on his contractual obligations. As discussed above, CIOA is intended to afford protection to consumers as potential purchasers of condominium units. That protection extends to a prompt disavowal of the contract because § 47-269 (a) provides that a purchaser may cancel a contract within fifteen days of the execution of the contract.[9] Such cancellation does not require a nexus between the reason for cancellation and any violation of CIOA, nor does it require that there be a violation at all. Other than this provision, the act was not intended as a vehicle for purchasers to avoid a purchase agreement by citing alleged violations bearing no relationship to the defaulting purchaser's acts. As in the HIA cases, allowing the plaintiff to use CIOA to shield his refusal to perform his contractual duties "would not be responsive to demands of justice and good conscience." *Habetz* v. *Condon*, supra, 224 Conn. 238. We, therefore, incorporate the HIA's "bad faith" exception to apply to CIOA cases.

We agree with the trial court's conclusion that the plaintiff's repudiation of this contract had no relation to any violation of CIOA by the defendants. We further conclude that a violation of CIOA does not, per se, allow the plaintiff to unilaterally rescind the contract and have his deposit returned.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[9] Similarly, HIA requires compliance with the Home Solicitation Sales Act, which in turn requires a statement allowing the buyer to cancel the transaction within three days. See General Statutes § 42-135a.