Judith P. LAVIN, Marcelino E. Lavin
and the Prudential Insurance
Company of America,

v.

**EMERY AIR FREIGHT CORP.**

Civ. No. 5:92CV636 HBF.

United States District Court,
D. Connecticut.

April 3, 1997.

John W. Cannavino, Steven I. Frenkel, Cummings & Lockwood, Stamford, CT, Robert M. Fleischer, Mark Randolph Jacobs, Jacobs Goldman, Norwalk, CT, Matthew J. Forstadt, Steven M. Frederick, Wofsey, Rosen, Kweskin. & Kuriansky, Stamford, CT, Gary Scott Klein, Benanti & Associates, Stamford, CT.

Matthew C. Mason, Gregory & Adams, Wilton, CT, Leslie. C. Storm, Zeisler & Zeisler, P.C., Bridgeport; CT, Carol K. Young, Schatz & Schatz, Ribicoff & Kotkin, Stamford, CT,

## CORRECTED RULING ON POST-TRIAL MOTIONS

FITZSIMMONS, United States Magistrate Judge.

This is a diversity action on a commercial lease brought against tenant Emery Air Freight to recover unpaid rent dating from August, 1992. The leased premises was Emery's former corporate headquarters in Wilton, Connecticut. Emery asserted sixteen affirmative defenses to plaintiffs' claim for breach of lease. A jury trial was held in this matter beginning on July 25 and the case was submitted to a jury on August 2, 1995.

At the close of the evidence, and before the case was submitted to the jury, plaintiffs moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a).[1] The Court reserved decision on the motion, and submitted the case to the jury. A briefing schedule was set after the jury returned its verdict. The parties filed simultaneous briefs consistent with this Court's scheduling order.[2]

### STIPULATIONS OF FACT

On or about December 28, 1966, Emery entered into a Lease Agreement (the "original lease") with Ralph M. Piersall and Judith P. Lavin for an 87,000 square foot office building located at 15 Old Danbury Road in Wilton, Connecticut. [Joint Trial Memorandum, Subsection 5 Joint Stipulation of Fact [Doc. # 118] (hereafter "Stip.") at ¶¶ 1 and

---

1. Plaintiffs moved for judgment as a matter of law stating "[t]here is no evidentiary basis in this case for a reasonable jury to find in favor of Emery on the issues which have been presented for consideration by the jury." [Tr. 8/2/95 at 33].

Rule 50(a)(1) of the Federal Rules of Civil Procedure provides that:
If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against the party with respect to a claim or defense that cannot under the controlling law

be maintained or defeated without a favorable finding on that issue.

2. Plaintiffs' filed a Motion for Judgment as a Matter of Law [Doc. # 168], Motion for Judgment on the Verdict Under Rules 49(a) and 58, Renewed Motion for Judgment as a Matter of Law under Rule 50(b) and Motion for New Trial under Rules 59 and 50. [Doc. # 172], and Supplemental Memorandum [Doc. # 176]. Defendant filed a Memorandum in Support of Jury Verdict [Doc. # 174], Reply Memorandum in Support of Jury Verdict. [Doc. # 171] and Reply to Supplemental Memorandum [Doc. # 177]. Defendant also filed a letter brief on April 29, 1996. [Doc. # 179].

8]. This lease was modified on November 28, 1967, and again on November 29, 1967. *Id.* at ¶¶ 2–3. On April 18, 1967, the Town of Wilton building inspector issued a Certificate of Occupancy, which stated that the "requirements of the Building Code and the Zoning Regulations of the Town of Wilton" had been "satisfied." *Id.* At ¶ 37.

In 1981, a new addition was constructed. [*Id.* at ¶ 9]. In connection with the new addition, Judith P. Lavin and Marcelino E. Lavin (the "landlords") and Emery (the "tenant") entered into a Lease Agreement dated October 1, 1981 (the "Lease"), which superseded the original lease. [*Id.* at ¶ 4, Pl.Ex. 1]. On October 13, 1981, Daniel J. McCauley, Vice President and General Counsel to Emery, wrote the Knights of Columbus stating

> On behalf of Emery Air Freight Corporation, I hereby certify to you that the building and all improvements located on the premises at 15 Old Danbury Road, Wilton, Connecticut which Emery Air Freight Corporation leases from Marcelino E. and Judith P. Lavin, and will be covered by your $3,500,000 mortgage, have been completed in accordance with the plans and specifications approved by Emery Air Freight Corporation. Emery Air Freight Corporation has accepted the premises.

[Pl.Ex. 13].

Modifications to the 1981 Lease were made on November 1, 1988, and on March 24, 1989. [Stip. at ¶¶ 6–7, Pl.Ex. 2, 3]. The Lease, as modified, contains a stated term to November 30, 2001. [Stip. at ¶ 5]. Under the terms of the lease, Emery is to pay rent to the Lavins on the first day of each month. Id. at ¶ 31.

On September 14, 1989, the Lavins entered into a Mortgage and Security Agreement with the Prudential Insurance Company of America to secure a Promissory Note in the principal amount of $11,500,000.00 made payable to Prudential. [Stip. at ¶¶ 26–27, Pl.Ex. 6]. Prudential took a first mortgage on the leased premises as security for the loan. In conjunction with the execution of the Mortgage, a Non–Disturbance Agreement dated

September 13, 1989 was executed by Emery, the Lavins, and Prudential. [Stip. at ¶ 21, Pl.Ex. 4]. Emery also executed a Tenant's Estoppel Certificate dated September 13, 1989, which states in part,

> Lessee (Emery) asserts no claim of default or offset or right to abate rent or defense against the payment of rent or other charges payable by Lessee and asserts no claim against Lessor (Lavins) under the Lease in regard to the premises occupied by Lessee.

*Id.* at ¶¶ 22–23, Pl.Ex. 5. The Estoppel Certificate further provides that "the improvements and space required to be furnished according to the Lease have been duly delivered by Lessor (Lavins) and accepted by Lessee (Emery)." [Stip. at ¶ 25, Pl.Ex. 5].

Consolidated Freightways, Inc. acquired Emery in April, 1989. [Def. Ex. 522, 536]. Emery continued to occupy the premises until the summer of 1992, when Emery relocated its offices and employees to Portland, Oregon, because of its acquisition by Consolidated. [Stip. at ¶ 34, Pl.Ex. 20]. In May, 1991, Emery counsel, Roy Truelson sent the Lavins a form letter, addressed to "Property Owner" and entitled "Excess Leased Facility." [Pl.Ex. 14]. It stated that, due to reduction "in the size of [Emery's] operation in response to continuing recessionary and cost pressures," the company headquarters in Wilton, Connecticut "is in the process of closing and the administration and disposal of excess properties has been transferred to this office." [Pl.Ex. 14]. The letter further stated that, "Emery has no use for the facility leased from you."[3] *Id.* Emery stopped making Lease payments in August, 1992. [Stip. at ¶ 34].

On September 30, 1992, the Lavins brought this action against Emery, seeking unpaid rent with appropriate interest thereon, together with costs, disbursements and reasonable attorney's fees. *Id.* at 32.

By November, 1992, Emery had removed its remaining personnel from the premises, leaving the building unoccupied. *Id.* at ¶ 35.

---

**3.** The letter continues, "[d]ue to staff reduction and paper work transfer, you may experience some delay in payment of your rent. I would like to discuss this problem and possible solutions." [Doc. # 102, Ex. K].

On December 2, 1992, defendant's counsel engaged Philip Helmes of Peterson Consulting Limited Partnership to perform a "property evaluation in regard to potential violations and strategy development for lease termination." [Helmes Depo. at 76, Doc. # 102, Ex. L].

No government official has given notice "(1) prohibiting occupancy of the building; or (2) stating that the Property violated or violates any law, code or ordinance." [Stip. at ¶ 37].

*JURY'S FINDINGS OF FACT: Plaintiff's Claim*

The jury found that:

1. Plaintiffs proved by a preponderance of the evidence that a contract was formed between Emery and the Lavins.

2. Plaintiffs proved by a preponderance of the evidence that the contract was supported by consideration.

3. Plaintiffs proved by a preponderance of the evidence that Emery breached the lease by failing to do what it promised.

4. Plaintiffs proved by a preponderance of the evidence that Emery (1) abandoned, vacated or deserted the premises; (2) failed to pay rent; (3) failed to pay taxes; (4) failed to pay sewer use charges; and (5) failed to pay sewer assessment fees.

5. Plaintiffs proved by a preponderance of the evidence that Emery's breach caused the Lavins to suffer damages.

6. The jury found that the Lavins were entitled to attorney's fees under the lease and damages for (1) unpaid rent in the amount of $5,572,609.17, (2) unpaid property taxes in the amount of $390,656.11, (3) unpaid sewer use charges in the amount of $9,890.53, (4) unpaid sewer assessment fees in the amount of $16,530.90, and (5) interest on unpaid rent in the amount of $838,746.81.

### CONCLUSIONS OF LAW

Before the Court are the parties' cross motions for decision on Emery's affirmative defenses. It is undisputed that Emery need only prevail on one of its many affirmative defenses to prevail in this action.[4] Plaintiffs argue that they are entitled to Judgment as a Matter of Law on each and every affirmative defense because (1) the doctrine of independent covenants prevents Emery from prevailing on its affirmative defenses; (2) Emery's affirmative defenses fail because Emery did not avail itself of the remedies prescribed in the lease; (3) Emery's affirmative defenses are legally untenable because of its failure to give Prudential notice and an opportunity to cure any alleged breach by the Lavins as required under the attornment agreement; and (4) Emery's execution of the tenant's estoppel certificate precludes it from recovering on any of its affirmative defenses.[5]

At trial, the Court reserved ruling on the remaining affirmative defenses and a verdict form containing thirty interrogatories was submitted to the jury. The interrogatories on Emery's affirmative defenses were submitted to assist the Court "in some of the matters that are questions of law." [8/2/95 Tr. at 45]. The Court stated, "what I'm going to do is I'm going to ask the jury for a factual determination and take up the legal import of the factual determinations after I see what they decide." [8/2/95 Tr. at 54].

The Court submitted instructions and twenty-three interrogatories to the jury on the affirmative defenses of (1) intentional,

---

4. At the end of the case, Emery asserted the following affirmative defenses: (1) inadequate consideration; (2) failure of consideration; (3) illegality; (4)frustration of purpose; (5) failure to act in good faith; (6) Lavins' default under the terms of the lease; (7) unconscionability; (8)impossibility; (9) commercial impracticability; (10) failure to mitigate damages; (11) first breach; (12) fraudulent inducement; (13) reckless misrepresentation; (14) negligent misrepresentation; and (15) constructive eviction. Other affirmative defenses were withdrawn by Emery.

5. Plaintiffs argue in the alternative that Emery failed to introduce legally sufficient evidence to support its affirmative defenses of (1) inadequate consideration, (2) failure of consideration, (3) illegality, (4) frustration of purpose, (5) failure to act in good faith, (6) Lavins' default under the terms of the lease, (7) unconscionability, (8) impossibility, (9) commercial impracticability, (10) failure to mitigate damages, (11) first breach, (12) fraudulent, reckless or negligent misrepresentation, (13) false representations, and (14) constructive eviction.

reckless and negligent misrepresentation,[6] (2) breach of warranty,[7] (3) breach of duty of good faith and fair dealing,[8] (4) unconscionability,[9] (5) commercial impracticability,[10] and (6) constructive eviction.[11]

■ Under ordinary circumstances, the Court would first rule on the affirmative defenses that were presented to the Court solely as questions of law, and then consider the factual findings of the jury in light of the law on the remaining affirmative defenses. However, because the defendant has argued all of the affirmative defenses with reference to the jury's answers to interrogatories, and has drawn legal conclusions from those answers which the Court believes are inaccurate or not consistent with the jury's findings, the Court will address the import of the jury's findings first and then analyze the affirmative defenses in light of the applicable law and the jury's conclusions where relevant.

*Effect of Jury Findings.* As a preliminary matter, the Court notes that the jury's verdict on select affirmative defenses was a special verdict governed by Fed.R.Civ.P. 49(a). Rule 49(a) states in relevant part that

The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue.

Fed.R.Civ.P. 49(a). "In determining whether a verdict is "general" or "special", the court looks to two factors, its own intent and the substantive charge given." *Manes v. Metro–North Commuter Railroad,* 801 F.Supp. 954, 957–58 (D.Conn.1992) (citing *Stanton v. Astra Pharmaceutical Prod.,* 718 F.2d 553, 574 (3rd Cir.1983)). It was this Court's intention to instruct the jury to make factual findings on some of the affirmative defenses, leaving the Court to later apply the law to the facts on the issues. This was clearly reflected at the charge conference and in the jury instructions. [8/2/95 Tr. 45, 54, Court Ex. 15 at 31–37]; Black's Law Dictionary at 1731 (4th Ed.1968) (defining general verdict as a verdict where jury pronounces at the same time the law and facts, either in favor of plaintiff or defendant, as distinguished from a special verdict where jury finds only facts and leaves the legal conclusions to the court.).

■ "A district court has a duty to reconcile the jury's answers on a special verdict form with any reasonable theory consistent with the evidence and to attempt to harmonize the answers if possible under a fair reading of the answers." *McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1311 (2d Cir.1993) (citations omitted); *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962); see *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427–28 (1995); *see also* Fed. R.Civ.P. 49(a). "If the jury's answers cannot

---

**6.** *See* Jury Interrogatories 7 through 9, the 18th, 19th and 20th affirmative defenses [Third Amended Answer, Doc. # 145 at 22–23] and Jury Charge on Misrepresentation [Court Ex. at 31] and Jury Interrogatories 10 through 11 and Jury Charge on Causation [Court Ex. 15 at 33].

**7.** *See* Jury Interrogatories 13 through 16 and Jury Charge on Breach of Warranty [Court Ex. 15 at 34].

**8.** *See* Jury Interrogatories 17 through 20, the 10th, 12th, and 13th affirmative defenses [Doc. # 145 at 20–21] and Jury Charge on Duty of Good Faith and Fair Dealing [Court Ex. 15 at 35].

**9.** *See* Jury Interrogatories 23–24, the 11th affirmative defense [Doc. # 145 at 22–23].

**10.** *See* Jury Interrogatories 21, 22 and 25 through 27, 15th affirmative defense [Doc. # 145 at 22], Jury Charge on Commercial Impracticability [Court Ex. 15 at 36].

**11.** *See* Jury Interrogatories 28 & 29, 6th and 7th affirmative defenses [Doc. # 145 at 19–20], Jury Charge on Constructive Eviction [Court Ex. 15 at 37].

be harmonized rationally, the judgment must be vacated and a new trial ordered." *Id.* (quoting *Brooks v. Brattleboro,* 958 F.2d 525, 529 (2d Cir.1992)).

Further, "in dealing with jury responses that are inconsistent, proper deference to the parties' Seventh Amendment rights to a jury trial precludes entry of judgment that disregards any material jury finding." *LeBlanc–Sternberg,* 67 F.3d at 428 (citing, *Atlantic & Gulf Stevedores, Inc.,* 369 U.S. at 364, 82 S.Ct. at 786). If the district court considers the jury's verdict to be inconsistent, the Court should seek an explanation by reference to the entire case which is supportable by the evidence and trial court's jury instructions. *Id., McGuire,* 1 F.3d at 1311 ("The district court should refer to the entire case and not just the answers themselves."). Thus, if the jury's answers cannot be harmonized, the court must order a new trial. *Id.* at 428. It is not the province of the Court "to enter judgment that overrules some of the jury's findings." *Id.*

The Court has carefully considered the jury's findings, the factual and legal contexts in which they were sought, and the application of the law underlying all of defendant's affirmative defenses to those facts. None of the factual findings alone or in combination establishes any of the affirmative defenses or the counterclaim.

For example, the jury did not find that the Lavins committed a fraud on Emery. It found that Emery did not prove that Marcelino Lavin lacked reasonable grounds to believe that the representations he made in the lease regarding the construction of the building and its compliance with applicable codes and regulations were true at the time they were made (Interrog.# 8), that Emery did not act on the representations in Article 1(c) to its detriment (Interrog.# 10), and that the plaintiff was *not* in a better position than Emery to know of the condition of the premises at the time the lease was executed (Interrog.# 11). All of these findings were consistent with the evidence that Emery designed and supervised the construction of the premises.

The jury's answer to interrogatory # 7 is not inconsistent with these findings. There was testimony that Lavin represented in the lease that he had constructed the premises, when in fact Emery was responsible for the construction.[12] Similarly, the jury found in answer to interrogatory # 13 that Lavin was negligent in connection with making the representations in Article 1(c) of the lease, a finding that was consistent with the evidence that Lavin did not consult with the architect or other professionals prior to representing that the building was completed in accordance with Emery's requirements.[13]

The jury's findings disposed of Emery's affirmative defenses of fraudulent inducement, reckless misrepresentation, and negligent misrepresentation (interrogatories 8, 10 and 11); failure to act in good faith/commercial unreasonableness (interrogatories # 17, 18, and 20); breach of warranty/default by the Lavins (interrogatories # 11, 13, 14, 15 and 16); unconscionability (interrogatories # 23 and 24); and constructive eviction (interrogatory # 28).[14]

**12.** *See* Doc. # 158, Tr. 7/31/95 at 126; Doc. # 160, Tr. 7/31/95 at 102.

**13.** *See* Doc. # 156, Tr. 7/26/95 at 196–197

**14.** Emery also makes a constructive eviction argument for the period after the receipt of the Peterson report. However, the jury's answer to interrogatory # 29, that Emery was unable to sublease the premises because they were untenantable, does not mean that the jury found that the premises had become uninhabitable. Rather, it can be harmonized with the evidence by reference to the testimony that during the period of time that Emery was seeking to sublease the premises, prior to the receipt of the Peterson report, real estate agents advised that it would require a substantial expenditure to make the premises usable by some other tenant than Emery. [*See, e.g.,* Doc. # 162, Tr. 8/1/95 at 237–240]. The jury did find that Emery's receipt of the Peterson report caused Emery to cease its efforts to sublet or assign its space [Interrog. # 27]; the jury was not asked to determine whether that was because Eberhard Schmoller actually believed that the premises were dangerous or because the company now had a basis on which to argue that they were no longer obligated to pay rent. Even if the former were true, the constructive eviction defense fails for other reasons, including the fact that the lease places on Emery the obligation to make all repairs to the premises. See note 16, *infra.*

No interrogatories were submitted to the jury on the defenses on inadequate consideration, failure of consideration, illegality, frustration of purpose, impossibility, failure to mitigate damages, and first breach, and none of the interrogatory answers, considered in context, establishes any of those defenses.

The stipulated facts establish that Emery paid rent and enjoyed exclusive right to occupy the premises from 1966 to 1992. In 1981, a new addition was constructed under Emery's supervision. On October 13, 1981, Daniel J. McCauley, Vice–President and General Counsel to Emery certified that "the building and all improvements ... ha[d] been completed in accordance with the plans and specifications approved by Emery Air Freight Corporation." [Pl.Ex. 13]. Emery exclusively occupied the premises through approximately July, 1992.

As of November 1, 1988, the parties entered into a lease modification, as contemplated in Article 7(c) of the 1981 lease, on new rental terms. [Pl.Ex. 1, Art. 7(c) and Pl.Ex. 2].

As of March 24, 1989, the parties executed a second lease modification in connection with the Lavins' refinancing of the property. In exchange for Emery's agreement that a new first mortgage could be placed on the property, the Lavins agreed that, if they refinanced, Emery would be released as guarantor of $4.5 million in mortgages.[15]

Consolidated acquired Emery in April, 1989. In May, 1991, Emery's counsel, Roy Truelson, notified the Lavins that Emery was in the process of closing the company headquarters, due to reduction "in the size of [Emery's] operation in response to continuing recessionary and cost pressures." The letter further stated that, "Emery has no use for the facility leased from you." [Pl.Ex. 14]. Indeed, by the summer of 1992, nearly all of Emery's personnel were gone. Emery stopped paying rent in August, 1992. Plaintiffs brought this lawsuit on September 30, 1992. The building was completely unoccupied by November, 1992. [Stip. at ¶ 34–35]. In December, 1992, defendant's counsel hired Philip Helmes to perform a property evaluation. Emery never made a single claim during its tenancy that the Lavins "breached any express warranty or delivered a building that was untenantable." [Doc. # 171 at 22].

■ *Consideration Defenses.* The consideration defenses fail as a matter of law. Emery enjoyed use of the premises for 26 years, until they were abandoned for reasons totally unrelated to any claimed defects. Nothing done by the Lavins precluded (or precludes) Emery from reoccupying the premises or from curing any defects that Emery believes exist and subletting the premises to others. The lease as negotiated between the parties vests in Emery the responsibility of making all repairs, and gives Emery certain remedies in the event of a breach by the landlord. Emery has neither undertaken to meet its responsibility under the lease nor availed itself of the remedies for which it negotiated in the lease.[16]

Paragraph 8(c) of the Lease states

Anything in this article 8 or in any other article of this lease to the contrary notwithstanding, on and after November 1, 1988, Lessor shall have no liability or obligation to Lessee for any repairs or maintenance whatsoever ... *it being the intention of the parties that this lease shall thereafter be construed as a "net, net net lease," with the Lessee's obligations and duties under this lease being to pay Lessor the rent due and otherwise to have all of the same responsibilities and duties ... it would have if it were the owner in fee of the premises hereunder leased.*

---

15. $3.5 million to the Knights of Columbus and $1.0 million to the Connecticut Development Authority. [Doc. # 168 at 10–11].

16. Although Eberhard Schmoller, Consolidated's chief legal officer, testified that he instructed Emery to discontinue payment of rent a second time after reviewing the consultants' findings in the Winter/Spring of 1993, because he concluded that the building could not be occupied, assigned or sublet, and "fixing the problem is the obligation of the landlord," *see* Doc. # 158, Tr. 7/28/95 at 224, 234, no request was ever made to the Lavins or Prudential to fix or repair the premises, no consent was sought for Emery to make the repairs, and Emery never made any request to share the cost of repair. *Id.* at 267. Schmoller also admitted that no government official has ever said the building could not be occupied. *Id.* at 289.

[Pl.Ex. 1, ¶ 8(c) (emphasis added) ]. The Lavins were obligated for one year after commencement of the lease "for all repairs to the addition to the building ... upon written request therefor from Lessee...." *Id.* ¶ 27(f). Indeed, Emery never gave written notice to the Lavins or Prudential under this provision or any other provision of the Lease. See *Id.* ¶ 21(b) (In the event of default, the lessor had ten (10) days to cure, or the lessee may cure the default at the expense of the lessor.); ¶ 35 (requiring written notice); ¶ 21(c) (lessee agreeing not to exercise any right of self-help without first giving thirty (30) days notice of default); Pl.Ex. 4 ¶ 2 (Attornment Agreement requiring Emery to give notice and opportunity to cure any alleged breach or default of the Lavins).

*Illegality, Frustration of Purpose, Impossibility, First Breach*

■ Similarly, the defenses of illegality, frustration of purpose, impossibility, and first breach fail because the circumstances in which Emery found itself when the lawsuit was filed were entirely of its own making. The record reflects that (1) there was no pre-lawsuit evidence of a building code violation; (2) the certificate of occupancy was never revoked or rescinded; (3) Emery did not provide plaintiffs with notice or opportunity to cure; (4) Emery made no attempt to cure the alleged defects; and (5) there was no evidence that the defects were irremediable.

■ If the premises were indeed defective, the lease obligated Emery to make all repairs and to act as the owner of the property. There is no evidence that it was impossible for Emery to perform under the lease—it was financially capable of paying the rent,

according to the testimony;[17] nor was there evidence that Emery's decision not to do what was necessary to sublease (i.e. renovate the premises) was anything other than a business decision.[18] First breach is not available as a defense in a situation like this, where Emery availed itself of the benefits of the lease for years, made a business decision to abandon the premises, and then, when sued for performance on the lease, obtained an opinion that asserted hitherto unidentified defects in a construction process over which the defendants had undisputed control.

[9] *Failure to Mitigate Damages.* Emery again raises the affirmative defense that the Lavins failed to mitigate their damages. However, the Lavins had no obligation to mitigate damages where they elected to sue for specific performance on the lease. *Dewart Building Partnership v. Union Trust Co.,* 4 Conn.App. 683, 687, 496 A.2d 241 (1985); *Rokalor, Inc. v. Connecticut Eating Enterprises, Inc.,* 18 Conn.App. 384, 388, 558 A.2d 265 (1989). There is no component of the landlord's obligation of good faith and fair dealing which would require the Lavins to mitigate damages in these circumstances; indeed, the lease obligated the defendant not "to cause the building to become vacant or deserted," *see* Pl.Ex. 1 ¶ 17, and thereby arguably imposed on Emery an obligation to find another tenant before the building was vacated.

*Commercial Impracticability.* Emery also asserts that the answers to interrogatories # 25 and 26 establish the defense of commercial impracticability, while plaintiffs suggest those answers are inconsistent with the evidence.[19]

---

**17.** Schmoller testified that at the time of the merger in 1989, "Emery was very near bankruptcy." Doc. # 158 at 240. Under Consolidated's management, aggressive cost cutting measures were instituted successfully. Emery went from a $120 million loss in 1989 to a $16.6 million profit in 1993, a year Emery paid no rent to the Lavins. *Id.* at 240–45. This was accomplished in part by relocating Emery employees to the West Coast and by Roy Truelson who was hired to help rid the company of excess properties including Emery's former headquarters *Id.* at 250, 259, 266.

**18.** Indeed, Schmoller testified that the rental payments were discontinued in August, 1992, to

get the Lavins to negotiate. [Doc. # 158, Tr. 278–82]. Yet, he was unaware of the offer Truelson made to the Lavins to pay three months rent in exchange for termination of the lease prior to August, 1992. *Id.* at 261. Moreover, he was unaware of any efforts by Emery or Truelson to list the property with a broker.

**19.** Interrogatory No. 25 asked:

Did the parties expressly agree that a continuation of the same market conditions for commercial real estate that prevailed at the time of the modification was a basic assumption on which the contract was based?

Interrogatory No. 26 asked:

The Court's instruction to the jury on commercial impracticability stated

Emery claims that its performance under the lease became commercially impracticable because of circumstances arising after the lease and modifications were executed. In order for a supervening event to discharge a duty under the doctrine of commercial impracticability, the non-occurrence of that event must have been a "basic assumption" on which both parties made the agreement. You should bear in mind that the continuation of existing market conditions or a continuation of the financial situation of the parties are ordinarily not such assumptions, unless the parties agree otherwise.

[Court Ex. 15 at 36].

■■■ The Court finds as a matter of law that Emery failed to establish the defense of commercial impracticability, even if the answers to interrogatories are interpreted to validate Emery's argument that the decline in rents in Fairfield County was not foreseen by the parties during the lease negotiations.[20]

■■■ Emery contends that two supervening events, the "severe market decline" and the "untenantability of the premises" [Doc. # 171 at 42], made its performance commercially impracticable.

A party claiming that a supervening event or contingency has prevented, and thus excused, a promised performance must demonstrate that (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party seeking to be excused has not assumed a greater obligation than the law imposes.

Was the rent established by the 1988 lease modification conditioned on a basic assumption by both parties that the same market conditions for commercial real estate that prevailed at the time of the modification would continue?

**20.** Plaintiffs argue that the interrogatory answers were inconsistent with the evidence because there was no evidence that the parties expressly made the existing market conditions a basic assumption on which the lease was based. Howev-

*Dills v. Town of Enfield,* 210 Conn. 705, 717, 557 A.2d 517 (1989) [citing 2 Restatement (Second) Contracts § 261; E. Farnsworth, Contracts (1982) § 9.6, p. 678]. However, these events never made Emery's performance under the lease impracticable. First, "[o]nly in the most exceptional circumstances have courts concluded that a duty is discharged because additional financial burdens [made] performance less practical than initially contemplated." Id. (citations omitted). But there is no claim that Emery abandoned the premises either because of severe market decline or the untenantability of the premises. It is undisputed that Emery experienced no additional financial burden as a result of the decline in the commercial rental market; there was no rental increase. The only "event" that might have been impracticable was the task of subleasing the premises in a time of severe market decline, but the evidence showed that, prior to the Peterson report, the premises were not subleased because they required a significant expenditure of money to make them "tenantable," that is, appropriate for another tenant, and that Emery declined for business reasons to make those expenditures. *See* Doc. # 162, Tr. 8/1/95 at 237–240. Thus, Emery's claim also fails under the third prong in *Dills,* that "the impracticability resulted without the fault of the party seeking to be excused. 210 Conn. at 717, 557 A.2d 517.

Furthermore, as exhaustively discussed in this ruling, defendant did not discontinue paying rent because the premises became untenantable for Emery. Emery made a business decision to stop paying rent after it abandoned the premises in order to negotiate a termination of the lease with the Lavins. Even if the Court accepts defendant's argument that the premises are untenantable now er, the answers *are* consistent with the evidence if one interprets the answers to Interrogatories # 25 and 26 in conjunction with the lease modification terms that provided for a rental adjustment based on increases in the consumer price index. (Schedule A, paragraph D to Plaintiff's Exhibit 2). There was considerable evidence on this provision, and how unusual it was for a commercial lease to incorporate such a provision. See, e.g. Doc. # 162, 8/1/95 at 203 *et seq.*

and cannot be leased at this time, defendant never fulfilled its obligations under the lease to notify the plaintiffs of the condition of the premises, to request · repair, or undertake repair and seek reimbursement. It is clear that the Peterson report was sent to plaintiffs not as notice pursuant to the lease but as part of a litigation strategy to threaten plaintiffs with a public disclosure which would reduce the market value of the property. [Def. Ex. 571.][21] Accordingly, it was not the condition of the premises alone that made performance impracticable, and defendant has failed to meet the first requirement in *Dills.* 210 Conn. at 717, 557 A.2d 517.

### The Causation/Nexus Requirement

Whether the Court's analysis focuses on the "causation" for Emery's abandonment of the premises or the absence of a "nexus" between Emery's breach and the condition of the premises, these affirmative defenses all fail as a matter of law. *See Fruin v. Colonnade One at Old Greenwich Ltd. Partnership,* 38 Conn.App. 420, 428, 662 A.2d 129 (1995) ("there must be a nexus between the claimed violations ... and the plaintiff's breach of the purchase agreement."); *MC Corp. v. DeProfio,* No. CVNH 9008–3925, 1991 WL 303793, *3 (Conn.Super.Dec.5, 1991) (rejecting defense of constructive eviction "where defendants failed to show the necessary causation between competition ... and the defendants' vacating the premises.").

■ The Court rejected Emery's after-the-fact arguments regarding the condition of the premises pretrial and does so now. · *See* Ruling on Plaintiff's Motion in Limine [Doc. # 133]. ` This is an instance where a party to a commercial lease stopped paying rent for reasons wholly unrelated to the condition of the premises and then, after breach, and after litigation was commenced, hired a property consultant to fashion grounds for reduction of defendant's financial obligation. This fact alone would be dispositive of all of the affirmative defenses under consideration here.

The claim of construction defects was only made in the course of this litigation.[22] There has never been any official government notice given "(1) prohibiting occupancy of the building; or (2) stating that the Property violated or violates any law, code or ordinance." [Stip. at ¶ 37]. Similarly, there is no objective evidence that the premises violated any building code and/or law, and no claims that Emery was in possession of or motivated by such facts when it abandoned the premises.

For the same reasons, defendant's belated request to amend its pleadings to assert an affirmative defense of mutual mistake · [*see* Doc. # 174 at 57] is DENIED.

### Doctrine of Independent Covenants

■ Even if there were objective evidence of a building code violation prior to

---

**21.** The letter was sent with a copy of the consultant's report by Emery's counsel to plaintiffs' counsel on May 17, 1993 for the stated purpose "to clearly and unequivocally telegraph exactly the steps we intend to take in the litigation." *Id.* at 267; Def. Ex. 571. The letter continued, "We believe that, once Emery "goes public" with the assertions and information set forth above, the value of the building in the public arena might be significantly adversely affected ... Emery will promptly proceed to maximize its litigation posture and prerogatives irrespective of whatever the concomitant deleterious affect on Prudential's collateral and the Lavins' asset will be." *Id.* A copy of this letter was sent to Roy Truelson.

**22.** In a similar action to recover rent for breach of a commercial lease, *Ansonia Mall Assoc., Ltd. v. First National Supermarkets,* a judge of the Superior Court held it was "inequitable for [defendant] to hit the plaintiff with this claim after [defendant] breached the lease and vacated the premises." No. CV89 02 88 84S, 1990 WL

272033, *8 (Conn.Super. April 26, 1990). In *Ansonia Mall,* the tenant had been "facing continuing losses at the store site and decided ... to abandon the property." *Id.* at *2. In *Ansonia Mall,* as here, "[t]he claim of a violation was not raised until after [defendant] abandoned the [premises]". *Id.* at *7. The Court found that "the lessee had the duty to assert its claim of breach within a reasonable period of time, and give the lessor an opportunity to cure the violation." *Id.* "Under the circumstances it is inequitable for [the tenant] to hit the plaintiff with this claim [for nonperformance of the lease terms] after [the tenant] breached the lease and vacated the premises." *Id.* at *8. The court concluded that "[c]onsidering the plaintiff's reasonable reliance on the lease and lack of knowledge of any claimed breach of it on its part, it would be inequitable for [defendant], which breached the lease, and failed to give the plaintiff notice of the claim and a chance to cure any default, to obtain an *ex post facto* reduction in overdue rent payments." *Id.*

Emery's abandonment of the premises, that would not have excused Emery from its obligation to pay rent. In Connecticut, a commercial lease is controlled by common law rules. *Thomas v. Roper*, 162 Conn. 343, 346–347, 294 A.2d 321 (1972); *Hayes v. Capitol Buick Co.*, 119 Conn. 372, 376–377, 176 A. 885 (1935); *Sigal v. Wise*, 114 Conn. 297, 304–305, 158 A. 891 (1932); *Lesser v. Kline*, 101 Conn. 740, 746, 127 A. 279 (1925). Under Connecticut common law, "the covenants of a lease are deemed to be independent so that a breach of the landlord's promise to perform services would not suspend the obligation of the tenant to pay the rent as agreed." [23] *S.H.V.C. Inc. v. Roy*, 37 Conn.Supp. 579, 585, 428 A.2d 806 (App.Div.1981) (citing 1 American Law of Property § 3.11; 1 Tiffany, Real Property (3d Ed.) § 88; 3 Thompson on Real Property § 1115), *no error*, 188 Conn. 503, 450 A.2d 351 (1982); *Greenwich Plaza, Inc. v. Whitman and Ransom*, No. CVNO 95054081, 1996 WL 240458, *15 (Conn.Super.Mar.19, 1996) (rejecting invitation to abandon common law of Connecticut); *Kaplan v. Novarro*, No. SPNH 9307–35915, 1994 WL 67112, *3 (Conn.Super.Jan.24, 1994) ("The covenants of a commercial lease are deemed to be independent, and the plaintiffs' alleged breach of any covenants in the lease may not be raised in an action for possession"); *Ten Granby Town Center v. Brignole & Bowen*, No. 9210–67472, 1993 WL 171373, *2 (Conn.Super.April 5, 1993) ("the covenants in a commercial lease are independent, such that plaintiff's breach of a covenant would not excuse defendant's breach."); *In re Edgewood Park Junior College*, 123 Conn. 74, 77–78, 192 A. 561 (1937) ("The independent covenants are in effect separate unilateral obligations.") (citing 3 Williston, Contracts § 890 (Rev.Ed), § 1329 (1920 Ed.); *Dornfeld v. Hom d/b/a/ Town Sun Kitchen*, No. SPH 9101–58760 HD, 1991 WL 86256, *2 (Conn.Super. April 2, 1991) (same); *Quintiliani v. Fuggetta*, No. SP–H–8308–19969, 1983 WL 187707, *3 (Conn.Super.Oct.6, 1983) ("In a commercial lease, the covenant to pay rent and a covenant to make repairs are independent of each other, and the failure of the landlord to keep his covenant does not relieve the tenant from his obligation to pay rent.").

In a commercial lease, "covenants are mutually independent obligations in the absence of clear evidence to the contrary in the lease." 49 Am.Jur.2d, *Landlord and Tenant*, § 84 (1995); *Dornfeld v. Hom*, No. SPH 9101–58760 HD, 1991 WL 86256, *2 (unless modified by statute or express provisions in the lease the covenants are independent). It follows that a tenant has a continuing obligation to pay rent, and a tenant's remedy for a landlord's breach "is by an independent action against the landlord for breach of covenant." [24] *Id.* at § 84. "An exception to the rule is that a breach of the landlord's implied covenant of quiet enjoyment by an eviction, actual or constructive, does provide a defense to an action for nonpayment of rent." *S.H.V.C.*, 37 Conn.Supp. at 585, 428 A.2d 806. However, constructive eviction would be a sufficient defense only "if the tenant had actually vacated the premises for that reason." *Id.; Thomas v. Roper*, 162 Conn. 343, 349, 294 A.2d 321 (1972); *Hayes v. Capitol Buick Co.*, 119 Conn. 372, 379, 176 A. 885 (1935). Emery cannot show the necessary causal connection between its decision to vacate the property and plaintiff's alleged breach. *MC Corp. v. DeProfio*, 1991 WL 303793, *3.

Accordingly, none of Emery's affirmative defenses excuses its independent obligation to pay rent under the lease as a matter of law.

Clearly, Emery had an independent obligation to provide notice and opportunity to cure to both the Lavins and Prudential. Under the terms of this Lease, Emery was required to provide the Lavins with written notice of any default, "demand or request" by registered mail, at a specified address, with a copy to Gregory & Adams, and an opportuni-

---

23. The common law that covenants of a lease are deemed to be independent has been modified by statute with respect to residential property but not commercial leases. *See* Conn. Gen.Stat. §§ 47a–1 through 47a–20.

24. At trial the Court held "as a matter of law that the covenants in the lease are independent covenants and under the circumstance...." [7/28/95 Tr. 215].

ty to cure. See Pl.Ex. 1 ¶ 21(b)(In the event of default, the lessor has ten (10) days to cure, or the lessee may cure the default at the expense of the lessor) and ¶ 35 (requiring written notice). Moreover, Emery was obligated under both the Lease, see Pl.Ex. 1 ¶ 21(c) (lessee agreeing not to exercise any right of self-help without first giving thirty (30) days notice of default), and the Attornment Agreement to give Prudential notice and opportunity to cure any alleged breach or default of the Lavins. See Pl.Ex. 4 ¶ 2.[25] It is undisputed that Emery failed to give notice and an opportunity to cure to the Lavins or Prudential as required by the Lease and Attornment Agreement.

Emery argues that the doctrine of independent covenants

> does not mean that a landlord ... can fraudulently induce a tenant into a lease ... breach *ab initio* a material warranty in the lease ... deliver a product which is untenantable ... violate his duty of good faith and fair dealing ... while ignoring the failure of both a basic express assumption and condition upon which the lease was predicated

[Doc. # 171 at 8–9]. Emery does not cite any case law to support this argument, which conflicts with both the stipulated facts and the jury's findings. More importantly, however, this rhetoric cannot mask the primary finding of this Court, which is that the absence of any evidence that Emery vacated the premises for reasons in any way related to the alleged breach by the Lavins makes these affirmative defenses unavailable to relieve Emery of its contractual obligation to pay rent.

### Estoppel Certificate

Because the Court has found that defendant has failed to prevail on any of its affirmative defenses, it is unnecessary to reach the issue of the effect of the Tenant's Estop-

pel Certificate, Pl.Ex. 5, executed by the defendant on September 13, 1989. In that certificate, issued to Prudential, Emery certified that

> Lessee asserts no claim of default or offset or right to abate rent or defense against the payment of rent or other charges payable by Lessee in regard to the premises occupied by Lessee. To the best of Lessee's knowledge and belief, there is no default by Lessor under the Lease.
>
> . . .
>
> The improvements and space required to be furnished according to the Lease have been duly delivered by Lessor and accepted by Lessee.

### Counterclaim for Declaratory Judgment

Since Emery has failed to prevail on any of its affirmative defenses and its counterclaim for misrepresentation and breach of warranty is precluded by the jury's findings in interrogatories # 8, 10, 11, 14, 15, and 16, defendant's claim for a declaratory judgment that it is not obligated to pay rent to plaintiffs is DENIED.

### CONCLUSION

For the reasons stated, plaintiffs' Motion for Judgment as a Matter of Law [Doc. # 168 & 172–1] is **GRANTED**, plaintiff's Motion for a New Trial [Doc. # 172–2] is **DENIED as MOOT**, and plaintiff's Motion for Judgment on Verdict Under Rules 49(a) and 58 [Doc. # 172–3] is **GRANTED** in accordance with this ruling.

JUDGMENT shall enter for the plaintiffs in accordance with the jury's verdict in the following amount:

| | |
|---|---|
| Unpaid Rent | $5,572,609.17 |
| Unpaid Property Taxes | $ 390,656.11 |
| Unpaid Sewer Uses Charges | $ 9,890.53 |
| Unpaid Sewer Assessment Fees | $ 16,530.90 |
| Interest on Unpaid Rent | $ 838,746.81 |
| **TOTAL** | **$6,828,433.52** |

---

**25.** The Attornment Agreement states in relevant part that

> Tenant hereby agrees that in the event of any act or omission by Landlord ... which would give Tenant the right ... to terminate the Lease, or to claim a partial or total eviction, Tenant will not exercise any such right (I) until it has given written notice ... to Prudential ... by registered mail ... and (ii) until a reasonable period for remedying such act or omission shall have elapsed following giving of notice and following the time when Prudential shall have become entitled under the Mortgage ... to remedy the same....

Pl.Ex. 4 ¶ 2.

The amount of attorneys' fees was left for determination by the Court.