JOHN A. ERRICHETTI ASSOCIATES *v.* LORETTA
G. BOUTIN

BOGDANSKI, PETERS, HEALEY, ARMENTANO and WRIGHT, Js.

Argued February 5—decision released April 14, 1981

*W. Fielding Secor,* for the appellant (defendant).

*Joseph P. Fasi,* with whom was *Joseph Adinolfi, Jr.,* for the appellee (plaintiff).

ARTHUR H. HEALEY, J. This case involves an application for an order under General Statutes

§ 52-410,[1] directing the defendant to proceed with arbitration under the terms of an agreement contained in a deed conveying certain property owned by Stuart Judd[2] to the defendant Loretta Boutin. The trial court granted the application and ordered the defendant to proceed with arbitration. This appeal followed.

Prior to 1968, Judd was the owner of land and buildings which constitute the Mattatuck Manufacturing Company, the pond which supplies the company with water for industrial use, the dam which creates the pond, land below the dam and pond, and a flume which conducts water from the pond to the

[1] General Statutes § 52-410 provides: "APPLICATION TO SUPERIOR COURT. A party to a written agreement for arbitration claiming the neglect or refusal of another to proceed with an arbitration thereunder may make application to the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when said court is not in session, to any judge thereof, for an order directing the parties to proceed with the arbitration in compliance with their agreement. Such application shall be by writ of summons and complaint, served in the manner provided by law. Such complaint may be in the following form: '1. On ...., 19.., the plaintiff and the defendant entered into a written agreement for arbitration, of which exhibit A, hereto attached, is a copy. 2. The defendant has neglected and refused to perform said agreement for arbitration, although the plaintiff is ready and willing to perform the same. The plaintiff claims an order directing the defendant to proceed with an arbitration in compliance therewith.' The parties shall be considered as at issue on the allegations of the complaint unless the defendant files answer thereto within five days from the return day, and the court or judge shall hear the matter either at a short calendar session, or as a privileged case, or otherwise, in order to dispose of the case with the least possible delay, and shall either grant the order or deny the same, according to the rights of the parties."

[2] The present plaintiff, Green Valley Developers, Inc., is the successor in title to Stuart Judd. John A. Errichetti Associates, stockholder and director of Green Valley Development, Inc., initially filed the present application for arbitration in the Superior Court. Upon motion and pursuant to court order, Green Valley was substituted as party plaintiff.

company. By warranty deed dated January 10, 1968, Judd conveyed to the defendant the land and improvements constituting the Mattatuck Manufacturing Company.[3] Judd also conveyed by this deed all his right, title and interest in that portion of a flume "running on, over or under the real property herein conveyed." The deed further provided that there was also conveyed "for the benefit of the property herein conveyed and uses to which it may be put (1) the non-exclusive right to draw water from said flume so long as water flows therethrough and (2) the right so long as Grantor's [Judd's] pond and the dam forming same continue to exist, to draw water into the flume from the Grantor's pond, provided, however, that both such rights are expressly conditioned on (a) the proper repair and maintenance by the Grantee [Boutin] at her cost of that portion of the flume running on, over or under other land of the Grantor not being conveyed hereunder; (b) the proper repair and maintenance by the Grantee at her cost of the dam forming the pond from which water is drawn into said flume and of the gate controlling the amount of water flowing into said flume and of the gate controlling the water flow over or through the same into the Mad River . . . ." The deed contained a specific proviso that "Grantor, his heirs or assigns, shall be under no duty whatsoever, in connection with said rights to draw water from said pond or said flume, to maintain, repair or replace the dam or its controls or regulate the flow of water into said flume or over or through said dam or perform any act to preserve the water level of the pond or the water flowing through said flume . . . ."

---

[3] In 1968, Judd still retained certain property, including that upon which the dam was situated.

The clause in the deed which generates this action provided the following: "In the event of any controversy between Grantor, his heirs or assigns, and Grantee, her heirs or assigns, in connection with the flow of water into or through said flume or over or through said dam or the repair or maintenance of said dam, its controls or the flume and the parties then in interest are unable to resolve their differences, Grantor, for himself, his heirs and assigns, agrees and by the acceptance of this deed Grantee, for herself, her heirs and assigns, agrees any said controversy(ies) shall be decided by arbitration in accordance with the rules and procedures of the American Arbitration Association."

In 1971, Judd conveyed a portion of the property he had retained, including the property upon which the dam is situated, to the plaintiff Green Valley Developers, Inc., which is the successor in title and interest to Judd. In February, 1972, the Department of Environmental Protection (DEP) began an investigation of the dam, pursuant to § 130 of Public Acts 1971, No. 872 (now General Statutes § 25-110),[4] because DEP found that the dam was "one which by breaking away or otherwise might endanger life or property." General Statutes § 25-111 provides that the commissioner of DEP

[4] General Statutes § 25-110, entitled "Powers and duties of commissioner. Notice of owners," provides: "All dams, dikes, reservoirs and other similar structures, with their appurtenances, without exception and without further definition or enumeration herein, which, by breaking away or otherwise, might endanger life or property, shall be subject to the jurisdiction conferred by this chapter. The commissioner of environmental protection shall formulate all rules, definitions and regulations necessary to carry out the provisions of this chapter and not inconsistent therewith. The commissioner or his authorized representatives may enter upon private property to make such investigations and gather such data concerning dams, watersheds, sites, structures and general conditions as may

"shall investigate and inspect or cause to be investigated and inspected all dams or other structures which, in his judgment, would, by breaking away, cause loss of life or property damage." If he "finds any such structure to be in an unsafe condition, he shall order the person, firm or corporation owning or having control thereof to place it in a safe condition or to remove it, and shall fix the time within which such order shall be carried out." Ibid.

In 1972, the engineering firm of Mozzochi Associates, which had been retained by DEP to inspect[5] and evaluate the spillway capacity of the dam, made its report and certain recommendations to DEP. The Mozzochi study concluded that if 7.5 inches of rain fell in a six hour period, no freeboard (the distance between the level of water and the top of the dam) would remain and the dam could not prevent the splashing of water over the top of the dam ("overtopping"). It also concluded that in the event of 5.1 inches of rain in a six hour period there

---

be necessary in the public interest for a proper inspection, review and study of the design and construction of such structures and of the environmental impact of such structures on the inland wetlands of the state. The commissioner may, when necessary, employ or make such agreements with geologists, other engineers, expert consultants and such assistants as may be reasonably necessary to carry out the provisions of this chapter. The owner of any dam, dike or similar structure under the jurisdiction conferred by this chapter shall notify the commissioner, by registered or certified mail return receipt requested, of the transfer of ownership of any such dam, dike or similar structure not later than ten days after the date of such transfer."

[5] Early in 1972, Edward J. Peik, P.E., on behalf of John Errichetti Associates, wrote to DEP asking that the dam be reviewed by DEP. The request apparently was generated by a suggestion by the Department of Housing and Urban Development (HUD), which was handling the financing on the development of multiple family housing by John Errichetti Associates on property downstream from the dam.

would be two feet of freeboard.[6]  This study made the following recommendations:  "(1) Provide an emergency spillway to prevent possible overtopping . . . ; (2) Remove all trees and growth from the downstream embankment; (3) Repair wash-out of downstream embankment west of spillway and 'dress-up' entire downstream embankment; (4) Divert surface runoff from streets easterly of the structure off of embankment onto natural ground." A further recommendation proposed the placement of obstructions "to prevent automobiles from crossing the bridge across the spillway."  DEP adopted the Mozzochi recommendations.

In 1977, DEP, in an order preceded by a finding that "[t]his dam . . . was found to be in an unsafe condition," ordered the plaintiff to "repair said dam in accordance with engineering plans and specifications prepared by Joseph A. Adams[7] . . . [s]aid work to commence by August 1, 1977 and be completed by January 1, 1978."  Pursuant to the DEP order, the plaintiff undertook the work and completed it in 1977 at a cost to the plaintiff of $14,400.  The plaintiff requested that the defendant proceed with arbitration concerning this work, pursuant to the agreement, but the defendant has refused to do so.

The court found that the work done included the following:  The construction of reinforced parapet

[6] The Mozzochi study's conclusions concerning the amount of freeboard available in the event of 7.5 inches of rain in six hours as well as of 5.1 inches of rain in the same period were both based on the assumption that the 40 inch sluice gate was open and discharging.

[7] Apparently Green Valley Developers, Inc. and/or John Errichetti Associates retained Joseph A. Adams, P.E., to draw the plans and specifications requested in the DEP letter of March 29, 1972, and the plans were drawn by Adams as shown in an exhibit dated February 2, 1974.

walls to raise spillway depth, the removal of all trees and growth from the downstream embankment, the raising of the height of the existing bridge, the repair of the walkway, and the filling in of eroded areas.[8] In addition, a new earthen embankment was built at the same elevation as the wall to prevent the water from running around and down the face of the west side. To prevent autos from using the bridge, stairs were installed, instead of the originally ordered gradual slope, with the consent of DEP. A new gate was installed in place of the old one in order to obtain entry to valves controlling the flow of the water. The gate had been shortened by the building of the wall to prevent the water from running over the dam.

The trial court disagreed with the defendant's claim that the arbitration clause of the deed did not cover the work done because the work amounted to "structural improvements" and was not "repair" or "maintenance" within the meaning of those terms as used by the parties and interpreted by our courts. On appeal, the defendant claims (1) that the dispute between the parties for the cost of the work done is not within the scope of the arbitration clause by virtue of the language in the deed obligating the parties to arbitrate "any controversy . . . in connection with the flow of water into or through said flume or over or through said dam" and (2) that the work done to the dam by the plaintiff, upon the order of DEP, constituted "capital changes and improvements in the nature of structural altera-

---

[8] The trial court found that the purpose of the filling in of eroded areas was needed to hold the dam in place, that is, to "prevent its destruction."

tions" and were neither "repairs" nor "maintenance" within the ordinary meaning of those words. We disagree.

Arbitration is a creature of contract; see, e.g., *Board of Education* v. *Bridgeport Education Assn.*, 173 Conn. 287, 290, 377 A.2d 323 (1977); and, being designed to avoid litigation and secure prompt settlement of disputes, is favored by the law. See *Hartford* v. *American Arbitration Assn.*, 174 Conn. 472, 480, 391 A.2d 137 (1978); *Gaer Bros., Inc.* v. *Mott*, 144 Conn. 303, 307, 130 A.2d 804 (1957). "But a person can be compelled to arbitrate a dispute only if, to the extent that, and in the manner which, he has agreed so to do. *Visselli* v. *American Fidelity Co.*, 155 Conn. 622, 624, 237 A.2d 561 [1967]; *Frager* v. *Pennsylvania General Ins. Co.*, 155 Conn. 270, 274, 231 A.2d 531 [1967] . . . ." *Marsala* v. *Valve Corporation of America*, 157 Conn. 362, 365, 254 A.2d 469 (1969). "Whether a particular dispute is arbitrable is a question for the court, unless, by appropriate language, the parties have agreed to arbitrate that question also. *Connecticut Union of Telephone Workers, Inc.* v. *Southern New England Telephone Co.*, 148 Conn. 192, 198, 169 A.2d 646 [1961]; *College Plaza, Inc.* v. *Harlaco, Inc.*, 152 Conn. 707, 206 A.2d 832 [1965]." *Frager* v. *Pennsylvania General Ins. Co.*, supra, 274. The "positive assurance" test of arbitrability, as laid down in *United Steelworkers of America* v. *Warrior & Guy Navigation Co.*, 363 U.S. 574, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960), is the law in this state. See *Board of Education* v. *Frey*, 174 Conn. 578, 581–82, 392 A.2d 466 (1978); *Policemen's & Firemen's Retirement Board* v. *Sullivan*, 173 Conn. 1, 7, 376 A.2d 399 (1977). "Under the positive assurance test, 'judicial inquiry . . .

must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance. . . . An order to arbitrate the particular grievance should not be denied unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *Board of Education* v. *Frey,* supra, 582.

This arbitration clause is broadly worded. See *Two Sisters, Inc.* v. *Gosch & Co.,* 171 Conn. 493, 497, 370 A.2d 1020 (1976); *A. Sangivanni & Sons* v. *F. M. Floryan & Co.,* 158 Conn. 467, 472, 262 A.2d 159 (1969). It encompasses "*any* controversy . . . *in connection with the flow of water* into *or* through said flume *or* over *or* through said dam *or* the repair *or* maintenance of said dam, its controls *or* the flume . . . ." (Emphasis added.) The scope of this language is such that the present controversy, which is "in connection with the flow of water," because of the necessity to control the flow of water, falls clearly within the scope of the arbitration clause. Moreover, the repeated and nonaccidental use of the disjunctive "or" demonstrates the spelling out of the separability of circumstances under which *any* controversy in connection with the flow of water could arise under the language of the arbitration clause. This clause, under the circumstances, is not ambiguous, so as to require construction against the plaintiff.

We also disagree with the defendant's contention that the work performed by the plaintiff cannot be considered as either "repair" or "maintenance." The DEP specifically found that the dam was "in an unsafe condition" and ordered the plaintiff "to

repair" it. The verb "repair" has been defined to mean "to restore to a sound or healthy state; to make good." Webster, Third New International Dictionary. The verb "maintain" means "to keep in a state of repair, efficiency or validity; to sustain against opposition or danger." Ibid. There is nothing to indicate that the parties had a technical or special meaning in mind when they used the words "repair" or "maintenance." Under the circumstances of this case, these words must be given their ordinary meaning. See *Leathermode Sportswear, Inc.* v. *Liberty Mutual Ins. Co.*, 150 Conn. 63, 66, 186 A.2d 79 (1962); *Perkins* v. *Eagle Lock Co.*, 118 Conn. 658, 663, 174 A. 77 (1934).

We conclude, then, that the work done by the plaintiff clearly falls within the scope of the arbitration clause.

There is no error.

In this opinion the other judges concurred.