[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON APPLICATION FOR ORDER TO PROCEED WITH ARBITRATION
On September 24, 2001, the court heard the petitioner's application for order to proceed with arbitration, concerning disputes which had arisen between the parties about the construction of a new home. Thereafter, at the court's direction, pursuant a briefing schedule, the parties submitted briefs concerning the application, the last of which was filed on December 26, 2001 (#108). After considering the evidence and the arguments of the parties, the court issues this decision concerning the application. For the reasons stated below, the application is denied.
 I. PROCEDURAL BACKGROUND
The petitioner, Wilson Building Design Associates, Inc. (Wilson), commenced this action with its application for order to proceed with arbitration, dated September 2, 2001. Therein, Wilson contends that, on September 27, 1999, it and the defendants, Mark G. and Roxanne E. Vanderkerckhove, entered into a written agreement for arbitration, as part of an agreement in which Wilson agreed to construct a home for the defendants. Wilson asserts that the defendants have declined to perform the agreement for arbitration and claims an order directing the defendants to proceed to arbitration. The defendants contend that there is no enforceable arbitration agreement, as the agreement violatesP.A. 99-246, "An Act Concerning Consumer Protection for New Home Construction" (also referred to below as the "New Home Construction Act" or the "Act" and codified in General Statutes § 20-417a, et. seq.). At the hearing before the court, plaintiff's Exhibit 1, was presented. The parties agreed that testimony was not required. No other evidence was offered.
 II. DISCUSSION A. Arbitrability
CT Page 1012
General Statutes § 52-410 (a) provides, in relevant part: "A party to a written agreement for arbitration claiming the neglect or refusal of another to proceed with an arbitration thereunder may make application to the superior court . . . for an order directing the parties to proceed with the arbitration in compliance with their agreement. . . ." Arbitration is favored as a means of settling private disputes. See Whitev. Kampner, 229 Conn. 465, 471, 641 A.2d 1381 (1994). "Nevertheless, a person can be compelled to arbitrate a dispute only if, to the extent that, and in the manner in which, he has agreed so to do." (Internal quotation marks omitted.) Id., 471-472. "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. . . . Arbitration is essentially a creature of contract, a contract in which the parties themselves charter a private tribunal for the resolution of their disputes. . . . Arbitration agreements are contracts and their meaning is to be determined . . . under accepted rules of [state] contract law. . . ." (Internal quotation marks, citations and footnote omitted.)Levine v. Advest, Inc., 244 Conn. 732, 744,714 A.2d 649 (1998).
"Whether a particular dispute is arbitrable is a question for the court unless, by appropriate language, the parties have agreed to arbitrate that question also." John A. Errichetti Associates v. Boutin,183 Conn. 481, 488, 439 A.2d 416 (1981). An order to arbitrate "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Id., 489.
"Whether the parties intended to submit the issue of arbitrability, as well as the merits of a claim, to an arbitrator, clearly depends on the parties' intent. Whether the parties intended to arbitrate the issue of arbitrability may be determined from an express provision to that effect or from the use of broad terms. . . . Unless the agreement shows such intent, the determination of the question of arbitrability remains a function of the court. . . . The courts, however, must not fail to examine the plain language of the contract and look at it as a whole in determining the parties' intent." (Citations omitted.) Scinto v. Sosin,51 Conn. App. 222, 227-228, 721 A.2d 552 (1998), cert. denied,247 Conn. 963, 724 A.2d 1125 (1999).
The arbitration clause in this matter is set forth in Exhibit 1, on the reverse side of a document entitled "Proposal," on what appears to be a form used by Wilson, in paragraph 13 (hereinafter referred to as the "Proposal contract").[1] In pertinent part, it provides: "[a]ny dispute or claim arising out of or relating to this agreement or the breach of CT Page 1013 performance thereof, shall be settled by arbitration in accordance with the rules than [sic] prevailing in conjunction with the American Arbitration Association. Judgment on the award rendered by the Arbitrators may be entered into any court having proper jurisdiction."
In substance, this arbitration clause is similar to that which was at issue in Scinto v. Sosin, supra. There, the arbitration clause provided: "[a]ny controversy or Claim arising out of or related to the Contract, or the breach thereof shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof, except controversies or Claims relating to aesthetic effect and except those waived as provided for in Subparagraph 4.3.5." Scinto v. Sosin,51 Conn. App. 226.
In resolving the issue of arbitrability in Scinto, the court noted that "[t]he arbitration clause defines the scope of arbitrability. It, however, does not provide for arbitration of arbitrability." Id., 230. Further, the court found that the trial court had jurisdiction to determine the question of arbitrability "because the parties did not manifest an intention to arbitrate the issue of arbitrability." Id.
Wilson argues that the court should find that, under the arbitration clause, "all issues surrounding the underlying construction contract must be determined by arbitration," "if it finds Par. 13 to be a part of a valid contract between the parties. . . . "(See plaintiff's memorandum in support of application for order to proceed with arbitration, p. 5) In support of this contention, it cites Carlin Pozzi Architects, P. C. v.Town of Bethel, 62 Conn. App. 483, 767 A.2d 1272 (2001), noting that the language of the clause at issue there is similar to that used here. InCarlin Pozzi, the issue was not whether or not there was an enforceable agreement to arbitrate; rather, the issues which the court determined were to be resolved in arbitration involved the timeliness of the demand for arbitration. See id., 486, 487, 489. In Carlin Pozzi,62 Conn. App. 487, our Appellate Court reiterated its adherence to its previous decision in Scinto v. Sosin, supra.
"Where . . . the issue is whether there is an enforceable agreement to arbitrate at all, the court must determine that issue. . . ." Judelsonv. Christopher O'Connor, Inc., Superior Court, judicial district of New Haven at New Haven, No. 371181 (May 2, 1995, Hodgson, J.) (14 CLR 253) (citing Success Centers, Inc. v. Huntington Learning Center, Inc.,223 Conn. 761, 768-769, 613 A.2d 1320 (1992)).
Here, as the plaintiff notes, the threshold question involves whether CT Page 1014 or not the applicant has proved that there is a valid arbitration agreement. As indicated, Connecticut law requires such an issue to be resolved by the court, not in arbitration.
 B. Enforceability 1. Contract Formation
"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) Tallmadge v. Iroquois GasTransmission System, 252 Conn. 479, 495, 746 A.2d 1277 (2000). Our Supreme Court reiterated, in Tallmadge, that "[a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather from one party's subjective perception of the terms." (Internal quotation marks omitted.) Id., 498. Moreover, "[e]specially in the context of commercial contracts, we assume that definite contract language is the best indication of the result anticipated by the parties in their contractual arrangements." Id., 500.[2]
The Supreme Court noted also that it has long held "that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme." (Internal quotation marks omitted.) Id., 502. The intent of the parties is to be "determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." Lawson v. Whitey's Frame Shop, 241 Conn. 678, 686,697 A.2d 1137 (1997).
"Contract language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." (Internal quotation marks and citations omitted.)Levine v. Advest, Inc., supra, 244 Conn. 746. "The rules of construction are applied only if the language of the contract is ambiguous, uncertain or susceptible of more than one construction." Id. CT Page 1015
Here, Exhibit 1 was presented as the embodiment of the parties' "engagements." The exhibit contains two agreements. In the first, which appears on a form entitled "Real Estate Contract," the heading "Greater Hartford Association of Realtors, Inc." appears just below the title (hereinafter referred to as the "Board contract.").[3] This document consists of five pages. Paragraph 15, entitled "Complete Agreement," on page 2 of 5 states, "This contract contains the entire agreement between Buyer and Seller concerning this transaction, and supersedes any and all previous written or oral agreements concerning the Property." Likewise, the second agreement, the Proposal contract, again on the pre-printed reverse side of the first page, in paragraph 3, states, in pertinent part, "[t]his entire agreement and the attached plans and specifications, if any, constitute the entire agreement between the parties hereto." There is no question that these agreements were intended to be integrated documents. See Tallmadge v. Iroqouis Gas Transmission System, supra,252 Conn. 503. As in Tallmadge, there is no doubt that the parties here intended these agreements "to be the complete and final expression of their contractual [relationship]." Id.
"To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. . . . If the minds of the parties have not truly met, no enforceable contract exists. . . . [A]n agreement must be definite and certain as to its terms and requirements. . . . So long as any essential matters are left open for further consideration, the contract is not complete." (Citations and internal quotations marks omitted.) L R Realty v. ConnecticutNational Bank, 53 Conn. App. 524, 534, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999). "An agreement to agree to a material term at a later time is no agreement at all." Lizotte v. Town of Enfield, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 367352 (August 31, 1999, Sheldon, J.).
The parties' dispute about the meaning of their agreements may be summarized as follows. Wilson contends that the Board contract was entered into on September 27, 1999, before the effective date ofP.A. 99-246, October 1, 1999, and contained the essential terms of agreement. The Proposal contract, which contains the above-cited arbitration clause, was accepted by the defendants on October 18, 1999,[4] after the effective date of the Act. Wilson contends that, in the Proposal contract, the parties supplemented the original agreement, by adding the "Construction Contract Terms" (a three page document) and the "New Home Specifications" (a five page document). (See Wilson's memorandum of law, CT Page 1016 p. 7.) Wilson asserts that, together, in the documents comprise one agreement, arguing that, in the later documents, the parties "agreed on more specific terms," including "a later agreement to refer all disputes to arbitration. All, however, were generated prior to the operative, October 1, 1999 date." (Emphasis in original, See Wilson's memorandum of law, p. 7.) As noted above, under Connecticut law, the date on which an agreement was "generated" does not make it binding; rather, acceptance is required.
In response, the defendants assert that the contract at issue was entered into by the parties on October 18, 1999, after the effective date of the Act, making the Act applicable to it. (See the defendants' memorandum of law, p. 3.) They contend that the Act renders the agreement unenforceable. (See the defendants' memorandum of law, pp. 5-10.)
On page 1 of 5, the Board contract lists, under paragraph 2, property which the buyers agree to purchase from the seller (Wilson), lot 18 on Viola Drive, East Hampton, Connecticut. In paragraph 4, the purchase price is stated as $245,080. Subparagraph (a) states: "[b]uyer has made the following deposit with this Contract, to be applied to the total purchase price, subject to collection: *see page 4 of 5"[5] after which the sum of 1,000 appears.[6] Notwithstanding the reference to page 4 of 5, as described below, page 5 of 5 describes the parties' understandings concerning the escrowing of deposits. Subparagraph 4(b) on page 1 of 5 states: "[b]uyer will make the following additional deposit on or before *upon approval of builder by Norwest approval of plans by Rand Const. calendar days after the date that this Real Estate Contract is fully executed, to be applied to the purchase price or closing costs, subject to collection: 4,000" (this deposit is referred to as the second deposit on page 5 of 5).[7] Subparagraph (c), concerning a purchase money note and mortgage, was left blank. The parties crossed out the text of preprinted subparagraph (d) and substituted for it, in hand-writing, "Credit from dep. on lot 500." Subparagraph (e) states: "[b]uyer will pay the following amount at the closing by bank or certified check by obtaining a bank or institutional Mortgage as described in Section 5: 196,064." Subparagraph (f) states, in hand-writing: "[b]uyer will pay the following balance at closing by bank or certified check 43,516." The parties' initials also appear next to the handwritten language of this subparagraph. Below, the total purchase price of $245,080 appears again.
At the bottom of page 1 of 5, spaces appear for "Buyer initial," "Seller initial," and "Broker initial." The dates for the initials of each is hand-written as having occurred on October 18, 1999.
On page 2 of 5, paragraph 6 refers to page 4 of 5 again concerning "Escrow of Deposits." As noted, it is page 5 of 5 which discusses this CT Page 1017 topic. At the bottom of page 2 of 5, once again the Buyer's and Broker's initials are dated on October 18, 1999, while the Seller's initials are dated September 27, 1999.[8]
Paragraph 21 on page 3 of 5 contains the following: "[w]hen signed by Buyer and Seller this is intended to be a legally binding contract." The Buyer's and Broker's signatures are dated September 3, 1999, while the Seller's is dated September 27, 1999.
Page 4 of 5 is entitled "Rider." The only portion which is filled in concerns the insulation disclosure for new homes. Once again, the signatures appear on September 3, 1999 for the buyers and the broker and on September 27, 1999 for the seller.
Page 5 of 5 is also entitled "Rider" and contains hand-written terms only. It is apparent that its numerical paragraph references are to those described above concerning page 1 of 5. As to paragraph 4, concerning "Price," it notes that the cost of the home is $194,380, while the price of the lot is $49,900.[9] It also states, "[l]and package is under a separate purchase sale contract yet included in this total cost (sales contract on lot 18 Viola Drive, [Valli Estates] East Hampton Ct.)."
With regard to paragraph 6, concerning escrow of deposits, it contains four subparagraphs. In subparagraph A, it states that $500 of the first $1000 deposit is being "held by Prudential turned over to Wilson Building Design upon agreement of home construction terms." The other $500 is listed, in subparagraph D, as being held by "C-21 Connecticut Realty Assoc as deposit on lot 18, 0 Viola Drive at Valli Estates." Thus, the parties agreed that Wilson was to receive none of the original deposit until terms concerning the construction of the home were agreed upon by the parties.
In subparagraph B, the parties agreed that the second deposit, of $4,000, was to be "given to Wilson Building Design at home construction contract signing." Clearly, when the Board contract was entered into, the parties contemplated negotiating terms and reaching agreement as to another contract, what they termed as the "home construction contract."
Subparagraph C is consistent with that understanding, since it provides that the third deposit, for the bulk of the purchase price, $196,064, was to be given to Wilson upon the lot closing and construction loan closing. Although page 5 of 5 states that it is dated on September 29, 1999, the date under the seller's signature is September 27, 1999.
From these terms, it is evident that the buyers made an offer to Wilson on September 3, 1999, which Wilson accepted on September 27, 1999. CT Page 1018 While, in the Board contract, they agreed on a total price, payment for the construction of the home was expressly contingent on their reaching agreement in the future on a home construction contract, the terms of which had not been agreed upon at that time. The Board contract is devoid of a description of the home which was to be constructed, payment for which would make up the substantial majority of the contract price.[10]
This finding is supported by the terms of the Proposal contract. This proposal is dated September 27, 1999, the same date on which the Board contract was accepted by Wilson. On page 1 of 11, it states that Wilson "hereby submit[s] specifications and estimates for: Construct new single family home (A Splash of Style) per attached preliminary drawings, construction contract terms, specifications: page(s) 1-5 and as follows herein: contingent upon approval of Norwest builder acceptance approval of preliminary plans by Rand Developers."[11] The contract price is listed as $194,380, the same as listed for the cost of the home in the Board contract.
Also on page 1 of 11, the "approximate start date" is listed as "2 weeks after acceptance and receipt of deposit." According to this page, payment is to be made by deposit of $5,000 and per the bank's disbursement schedule. Under "Acceptance of Proposal," the following appears: "[t]he above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payment will be made as outlined above."
The date of Acceptance is listed as October 18, 1999. Next to it, the signatures of the defendants appear.
Other terms in the Proposal contract refer to it as a contract itself For example, paragraph 12 on the reverse side of page 1 of 11 refers to cancellation of "this contract." Paragraph 18 on the same page refers to "the work in this contract. . . ."
Attached to this document are three pages on Wilson's stationery, the first of which is entitled "Construction Contract Terms." It is evident that these terms are those referred to as the "attached . . . construction contract terms" incorporated by reference on page 1 of 11 of the Proposal contract. Notably, although the first paragraph of the Construction Contract Terms states that "[t]his agreement" was entered into on September 27, 1999, it contains no signatures or initials. It also states that a deposit of $5,000 is to be paid at the signing of this contract, with the balance "to be paid throughout the construction phases according to buyer's bank disbursements." Closing was scheduled to occur on or before February 28, 2000.[12] Article VII reiterates that "[t]his contract contains the complete agreement of the parties. . . ." Notably, CT Page 1019 neither page 1 of 11 of the Proposal Contract (or its reverse side) nor the Construction Contract Terms refer to the Board contract.
In addition, attached are the "New Home Specifications" referred to on page 1 of 11 of the Proposal contract, also on Wilson's stationery. These five pages provide the details of the home to be constructed by Wilson. As noted, the Board contract does not set forth specifications, except concerning the use of fiberglass insulation.
In support of its argument that if a contract existed before October 1, 1999,[13] the effective date of the New Home Construction Act, the court must find the agreement to arbitrate contained in the Proposal contract to be enforceable, Wilson cites Lynch v. Davis, 181 Conn. 434,438, 435 A.2d 977 (1981). There, in setting forth the test for the validity of written agreements for the sale of real property under the statute of frauds, General Statutes § 52-550, our Supreme Court noted that the essential terms "must at least consist of the subject of the sale, the terms of it and the parties to it, so as to furnish evidence of a complete agreement." (Internal quotation marks omitted.) Id. Further, the court noted that the memorandum of the contract need not be the contract itself, "instead it is sufficient if the memorandum, with reasonable certainty, furnishes reliable evidence that the parties have come to a complete agreement." Id., 438-439. "The statute of frauds requires that the essential terms and not every term of a contract be set forth therein." Fruin v. Colonnade One At Old Greenwich Ltd.,38 Conn. App. 420, 426, 662 A.2d 129 (1995), affirmed, 237 Conn. 123,676 A.2d 369 (1996).
As stated above, here the Board contract explicitly states that, at the time of its acceptance, September 27, 1999, the parties' future obligations depended on their reaching agreement on a separate, other agreement. The buyers' obligation to make an additional deposit of $4,000, beyond the initial $1,000, of which Wilson was only entitled to receive $500 after agreement to the "home construction terms," was not due until after the signing of the then-contemplated "home construction contract." Clearly, the "home construction contract" was the Proposal contract, containing the "Construction Contract Terms," and the specifications. As of September 27, 1999, the Proposal contract was a proposal only; it was not accepted until October 18, 1999.[14] Without agreement to its terms, there would have been no details as to the home which was to be constructed, except concerning insulation. The parties expressly did not agree, in the Board contract, to a contract under which Wilson could have built a home according to any plan or specifications it chose unilaterally to utilize. In fact, they agreed to the opposite, that further obligations would be incurred when such terms had been agreed to by the parties. CT Page 1020
An analogy to this situation is that involving the legal effect of a binder for the sale of real estate. In the recent case of Srager v.Koenig, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 305625 (July 15, 1997, Stevens, J.), the court noted that, "if the execution of a formal contract was an essential term of the agreement, the parties would not be bound to proceed with the sale in the absence of this contract even if all the other material terms of the contract were agreed upon. On the other hand, cases also hold that if all the material terms have been agreed upon, a court may be able to infer that the formal contract merely represents a memorial of the agreement already finalized by the parties' mutual assent." Id. Further, the court stated, "[t]he general rule is that an agreement to agree is too indefinite to be legally binding when it requires a superseding contract the terms of which must be negotiated. . . . However even such an agreement requiring the parties to negotiate a subsequent contract may nevertheless impose preliminary obligations on the parties if that is their intention." (Citation omitted.) Id. Without question, the language utilized in the Board contract evidences the parties' understanding that all the material terms were not yet agreed upon since they had yet to agree on the scope of the work involved in the construction of the new home.
Of significance to the court in Srager in ascertaining the parties' intent was the fact that a substantial deposit was to be paid when the superseding contract was signed. "The contemplated payment of the significant portion of the deposit only upon the signing of the superseding contract further points to the parties' intention to be bound to the sale only by this contract." Likewise, in the Board contract, as cited above, the parties here agreed that Wilson would receive a portion of the initial deposit "upon agreement of home construction terms" and the second deposit "at home construction contract signing." Prior thereto, Wilson had no contractual right to any payment.
The Board contract contains no agreement to arbitrate. It is the Proposal contract, the "home construction contract," only which contains the arbitration clause. Wilson has not pointed to any language in the Proposal contract which states that it was meant to be part of or an amendment of or a modification to the Board contract. Rather, from the evidence before it, Exhibit 1, the court finds that the parties intended the Proposal contract to be a construction contract which is related to, but separate from the preliminary, Board contract. See Green v.Connecticut Disposal Service, Inc., 62 Conn. App. 83, 95, 771 A.2d 137, cert. denied, 256 Conn. 912, 772 A.2d 1124 (2001).[15] Thus, the arbitrability of this dispute depends on the enforceability of the Proposal contract, as it pertains to the agreement to arbitrate set CT Page 1021 forth. therein.
 2. Effect of the New Home Construction Act
Under Connecticut law, a contract is not entered into until acceptance has occurred. L R Realty v. Connecticut National Bank, supra,53 Conn. App. 534. "The law is: `[a] contract is made when and where the last thing is done which is necessary to create an enforceable agreement.' (Internal quotation marks omitted.) Pettey v. Group 44,
Docket No. 067705, Superior Court, judicial district of Litchfield (February 26, 1996, Pickett, J.). See, also, McFadden v. NationalExecutive Search, Inc., 354 F. Sup. 1166, 1170 fn. 8 (D. Conn. 1973);Electric Regulator Corp. v. Sterling Extruder Corp., 280 F. Sup. 550,555 (D. Conn. 1968). A completed contract requires an offer and an acceptance." Thornton Co. v. Pennsak, Inc., Superior Court, judicial district of New Britain, Docket No. 490607 (Nov. 20, 1998, Robinson, J.)
(23 CLR 532).
On its face, the Proposal contract states that it was accepted on October 18, 1999. While the Construction Contract Terms, which are annexed to the two-sided first page of the Proposal contract, state "[t]his agreement entered into this 27th day of September, 1999. . . .," this portion of the parties' agreement is not signed or initialed. In contrast, the first page (1 of 11) of the Proposal contract states the date of the proposal as being September 27, 1999, and explicitly lists the "Date of Acceptance" as October 18, 1999, and contains the signatures of the defendants (there referred to as the owners) adjacent thereto. Since these documents each. appear on Wilson's stationery (the Proposal contract is evidently based on a form utilized by Wilson) and were evidently prepared by Wilson, any ambiguity concerning the date of acceptance must be construed against Wilson. See Imperial Casualty Indemnity Co. v. State, 246 Conn. 313, 329, 714 A.2d 1230 (1998) (general rule that ambiguous provisions construed against drafter). The court finds, from the clear language on its face, next to which the defendants' signatures appear, that the Proposal contract was accepted on October 18, 1999.
The court notes Wilson's argument, presented in its reply brief, to the effect that, if the court finds that any agreement existed before the effective date of the New Home Construction Act, it is "constitutionally restrained from finding that the new act applies and in any way impairs the original agreement." (See reply brief, p. 3) The Act is not interpreted here to impair rights existing under the Board contract, which pre-dated the Act's effective date. See also Elida, Inc. v. HarmorRealty Corp., 177 Conn. 218, 222-225, 413 A.2d 1226 (1979). Rather, the Act is applied hereto ascertain the enforceability of the Proposal CT Page 1022 contract, which was entered into after its effective date.
P.A. 99-249 was approved on June 29, 1999 and became effective on October 1, 1999. See General Statutes § 2-32. Under Section 1,P.A. 99-246 defined "Contract" to mean "any agreement between a new home construction contractor and a consumer for the construction of a new home."[16] "New home" is defined there as meaning "any newly constructed single family dwelling unit. . . ." Section 2 provides: "(a) No person shall engage in the business of new home construction or hold oneself out as a new home construction contractor unless such person has been issued a certificate of registration by the commissioner in accordance with the provisions of this act."[17]
Further, P.A. 99-246 provides, in section 4, that a new home construction contractor, prior to entering into a contract with a consumer for new home construction, shall provide to the consumer a copy of the contractor's certificate of registration and a written notice containing various components.[18] In addition, in subparagraph (b), this section states: "A new home construction contractor shall include in every contract with a consumer a provision advising the consumer that the consumer may be contacted by such contractor's prospective consumers concerning the quality and timeliness of such contractor's new home construction work, unless the consumer advises such contractor, in writing, at the time the contract is executed, that the consumer prefers not to be contacted."[19]
In addition, in subparagraph (d), this section provides that no person shall "engage in the business of a new home construction contractor . . . without having a current certificate of registration under this act. . . ."[20] Other sections of the Act provide for civil and criminal penalties for violations of this part of the Act. (See sections 5 and 6.) In addition, section 7 provides that "[a] violation of any of the provisions of this act shall be deemed an unfair or deceptive practice under subsection (a) of section 42-110b
of the general statutes," the Connecticut Unfair Trade Practices Act (CUTPA).[21]
It is undisputed that the Proposal contract involved new home construction as defined by the Act. It is undisputed also that Wilson did not comply with the Act in connection with the Proposal contract. In response to the defendant's brief, p. 9, which reiterated this point, Wilson's reply does not contend that such compliance occurred; rather, it contends that the Act does not apply to the parties' agreement.[22] As stated above, the evidence before the court indicates that the Proposal contract was proposed on September 27, 1999, but not entered into until October 18, 1999. Under the circumstances, in view of the Act's effective CT Page 1023 date of October 1, 1999, compliance with the Act was required thereafter, including on October 18, 1999, when the Proposal contract was entered into by the parties.
An agreement to arbitrate must be enforceable as a matter of law. See General Statutes § 52-408.[23] This court finds that the arbitration clause in the Proposal contract is unenforceable as a result of the lack of compliance with the Act which occurred. In reaching this conclusion the court is guided by our Supreme Court's recent decision inSolomon v. Gilmore, 248 Conn. 769, 731 A.2d 280 (1999), and the caselaw cited therein. In that case, the court concluded that a secondary mortgage issued by a lender in violation of the licensing requirements of General Statutes § 36a-511 was not enforceable against a mortgagor in a foreclosure action. See id., 773.
The court noted that § 36a-511 does not expressly address the enforceability of a contract entered into by an unlicensed lender. See id., 774. The same is true of P.A. 99-246; it does not address the enforceability of a contract entered into by an unlicensed contractor in violation of its terms. In addressing the question, the court in Solomon
stated, "[o]ur approach to this question, however, is guided by three well settled principles of law. First, in light of the fact that §36a-511 does not expressly address the enforceability of a contract entered into by an unlicensed lender, we undertake our consideration of this question bearing in mind that in construing statutes, our fundamental objective [is to ascertain and give effect] to the apparent intent of the legislature. . . . Second, it is well established that contracts that violate public policy are unenforceable. . . . Third, the secondary mortgage act is a remedial statute that is intended to protect the consumer. Thus, because remedial statutes should be construed liberally in favor of those whom the law is intended to protect . . ., we liberally construe the secondary mortgage act in favor of the defendant." (Internal quotation marks and citations omitted.) Id., 774-775.
After reviewing the provisions in the secondary mortgage act, the court stated that, first, "the licensing requirement generally aims to protect consumers by prohibiting certain unscrupulous lending practices. Second, because licensed lenders are subject to this comprehensive scheme of rules, § 36a-511 serves an integral role in the statutory scheme through which the legislature exercises control over the secondary mortgage industry in Connecticut. Third, by expressly authorizing statutory penalties for violations of the licensing requirement, §36a-511 serves as a deterrent to persons who might otherwise avoid the licensing requirement in order more readily to engage in unscrupulous lending. The enforcement of mortgages taken by unlicensed lenders in foreclosure proceedings would thwart each of these purposes." Id., CT Page 1024 776-777.
The above-cited portions of the New Home Construction Act reflect similar legislative purposes. The Act generally aims to protect consumers by prohibiting certain unscrupulous practices. The Act serves an integral role in the statutory scheme through which the legislature exercises control over the home construction industry in Connecticut. It authorizes statutory penalties for violations of its licensing requirements, also to serve as a deterrent. Enforcement of an arbitration clause in an agreement entered into without statutory compliance would thwart these purposes.
In addressing these issues, the court in Solomon also looked to the legislative history of the act in question to ascertain its purposes. See id., 782. The legislative history of P.A. 99-246 reflects that its purposes include bringing new home contractors under the same regulatory supervision as home improvement contractors are subject to under the Home Improvement Act, General Statutes § 20-418 et seq. (See remarks of Rep. O'Neill, Feb. 4, 1999, Joint Standing Committee Hearings, General Law, part 1, p. 000012.) At the same hearing, Attorney General Blumenthal stated that the bill "relates to extending all of the protections that we currently provide to people who are victims of home improvement contractor fraud when they are victims of the same kind of fraud or simple aggravated negligence involving new home construction." (See id., p. 000014.)
"Moreover, [i]t is unquestionably the general rule, upheld by the great weight of authority, that no court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged right directly springing from such contract." (Internal quotation marks omitted.) Solomon v. Gilmore, supra, 248 Conn. 785.
While, in contrast to the Home Improvement Act,[24] the New Home Construction Act does not expressly provide for the invalidation of arbitration agreements entered into in violation of its terms, that is not dispositive. As the Court in Solomon reiterated concerning the Home Improvement Act, "the remedial purposes of the statute would be impaired by allowing a contractor who had violated the provisions of General Statutes (Rev. to 1987) § 20-429 to recover. . . ." (Footnote omitted.) Id., 787. As noted, in view of its remedial purpose, the Supreme Court in Solomon determined that the secondary mortgage act, which also did not expressly invalidate contracts entered into in violation of its terms, nevertheless invalidated an agreement which did CT Page 1025 not comply with it.
The same analysis applies to the New Home Construction Act and the parties' agreement here. Based on the record currently before the court, since the Proposal contract was not entered into in compliance withP.A. 99-246, the arbitration clause contained in it is not enforceable.[25]
 CONCLUSION
For the foregoing reasons, the petitioner's application for an order to proceed with arbitration is denied. It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT